IN THE UNITED STATES DISTRICT CO URT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL D'ANTONIO, as the plenary conservator
And next friend of TYLER WHEELER, and NIKKI
LAWRIE, as the guardian and next friend of A.W.,
a minor;

      Plaintiffs,

v.                                     Case No. 1:21-cv-01027 JB/GBW

NEW MEXICO CORRECTIONS DEPARTMENT;
CENTENE CORPORATION; MHM HEALTH
PROFESSIONALS, LLC; CENTURION
CORRECTIONAL HEALTHCARE OF NEW MEXICO, LLC;
DAVID UDERO; NATALIA HUDSON, R.N.;
SHERI PIERCE, H.S.A.; and
JOSE G. ANDRADE-BARRAZA, M.D.;

      Defendants.

## PLAINTIFFS' OPPOSED UNDER FED. R. EVID. 702 TO LIMIT THE TESTIMONY OF DEFENSE EXPERT STEPHEN SARIS, M.D [Doc. 258]

Plaintiffs, by and through their attorneys. requests that the Court limit the testimony of defense neurosurgeon expert Stephen Saris, M.D., under Fed. R. Evid. 702 by prohibiting him from testifying that:

(1) Earlier surgical treatment would not have made a different for Tyler Wheeler.

(2) Brain cells can survive without oxygen for minutes to hours,

(3) Tyler Wheeler's artery did not start bleeding until after 9:00 pm,

Counsel for Defendants were contacted and indicated their opposition to this motion.

## FACTUAL BACKGROUND

On November 10, 2024, Tyler Wheeler sustained a traumatic skull fracture and a subsequent epidural hematoma while he was an inmate at the Southern New Mexico Correctional Facility.  As a result of the skull fracture, a fragment of Tyler Wheeler's skull cut

open an artery in his brain. The cut artery bled and caused an epidural hematoma. As the epidural hematoma grew in size, the pressure within Tyler Wheeler's skull increased. The increased pressure compressed Tyler Wheeler's brain and restricted blood flow to his brain. Without blood flow, brain cells and tissue were deprived of oxygen and die, resulting in significant infarcts (i.e., partial brain death). [**Doc. 258-1,** Depo Dr. Santos, 62:10–63:7].

The Centurion Defendants have identified Stephen Saris, M.D. as their expert in the field of neurosurgery.  [**Doc. 258-2,** Depo. Saris, 7:1-14, 13:24-14:3]. Part of Dr. Saris' opinion is that Tyler Wheeler's neurological outcome would have been the same regardless of when he was sent to the hospital and underwent surgery. The purpose of this opinion is to challenge Plaintiffs' expert that delay in sending Tyler Wheeler to the hospital caused additional damage to Tyler Wheeler's brain. Every non-party medical provider in this case, except Dr. Saris, agrees that the brain requires oxygen, increased brain pressure cuts off blood flow and oxygen, and the lack of blood flow causes brain cells to die. [**Doc. 258-1**, Depo. Santos, 50:3-23, 62:10-63:7]; [**258-3,** Depo. Fowlkes, 171:12-173:5]; [**Doc. 258-4,** Depo. Stein, 78:2-80:7]; [**Doc. 258-5,** Depo. Davis, 81:13-82:2]; [**Doc. 258-6,** Depo. White, 89:19-100:15]. Of the three non-party medical providers that were asked how long a brain cell could live without oxygen, all but Dr. Saris stated that brain cells die within minutes of being deprived oxygen. [**Doc. 258-3,** Depo. Fowlkes, 171:12-173:5]; [**Doc. 258-6** Depo. White, 97:18-24]. The medical literature cited in reports and depositions supports that brain cells die within minutes without oxygen, and that brain injuries that interrupt blood flow need to be treated immediately given how quickly brain cells will die without oxygen. *See* Janice Hinkle and Karry Cheever, *Brunner & Suddarth's TExbook of Medical-Surgical Nursing, 14th Ed.*, (Wolters Kluwer 2018) at pg. 2036 ("The brain cannot store oxygen or glucose to any significant degree. Because the cerebral cells need an uninterrupted

blood supply to obtain these  nutrients, irreversible brain damage and cell death occur if the blood supply is interrupted for even a few minutes."); *see also* American Association of Neurological Surgeons, "Stroke," (available at https://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Stroke) ("It is crucial that proper blood flow and oxygen be restored to the brain as soon as possible. Without oxygen and important nutrients, the affected brain cells are either damaged or die within a few minutes."); American College of Surgeons, *Advanced Trauma Life Support Student Course Manual, 10th Edition*,  "Chapter 6: Head Trauma," (2018) pg. 104 ("The most important ways to limit secondary brain damage and thereby improve a patient's outcome are to ensure adequate oxygenation and maintain blood pressure at a level that is sufficient to perfuse the brain.").

Despite the consensus of all non-party medical providers and the disclosed literature the essentially time is brain and brain bleeds require immediate treatment to limit the damage, Dr. Saris intends to testify that Tyler Wheeler's outcome would not have been any different had any received treatment earlier. Part of this opinion is based on the unsupported contention that brain cells can live minutes to hours without oxygen.  **[Doc. 258-2,** Depo. Dr. Saris, 24:13 – 26:25, 28:22 – 30:14, 114:21 – 115:3]. When asked if increased pressure in the brain will cut off blood flow, he testified "I actually don't know." [*Id.* at 22:3-16]. When asked how long a brain cell could live without oxygen, Dr. Saris testified "I have no idea." [*Id.* at 24:20-22]. When asked how long the brain could live without oxygen, Dr. Saris testified "minutes to hours." [*Id.* at 25:5-12]. Plaintiff's counsel asked Dr. Saris for his support for this contention, and he stated "Education, training, experience." [*Id.* at 114:12-117:22].  Plaintiff's counsel asked Dr. Saris what experience he had where a patient had brain cells live when being deprived of oxygen for an hour. [*Id.*] He did not know. [*Id.*]  Plaintiff's counsel asked Dr. Saris what medical literature

he was relying upon,  he stated, "I don't know." [*Id.*] He stated that he encountered sometime in medical school 40 years ago. [*Id.*]

Another part of Dr. Saris' opinion that earlier surgical treatment would not have made a difference is his claim that Tyler Wheeler's spontaneously "open[]ed up" after 9:00 pm, which was an hour after the trauma that caused the skull fracture occurred. [*Id.* at 94:11 – 96:5, 118:7 – 120:5]. His testified that an altercation occurred at 7:45 pm that caused head trauma, and then after 9:00 pm, for reasons unknown, the meningeal artery "really let loose" between 9:00 and 10:00 pm. [*Id.*] He further testified that the artery was not bleeding before 9:00 pm. [*Id.*]. His testimony amounted to the opinion that, "for whatever reason, between 9:00 and 10:00, the artery opened up and caused his rapid decline." [*Id.* at 95:14-17]. When asked for the basis, he simply stated from being a neurosurgeon. [*Id.* at 95:18-96:2]. He testified that he was confident there was not medical literature that would answer the question and it was simply common sense. [*Id.*] When asked how he knew the bleeding did not start before 9:00 pm, he testified "I don't." [*Id.* at 96:3-5].

These opinions – that delay made no difference, brain cell can live without oxygen for hours, the artery started bleeding after 9:00 pm – lack foundation or basis and contradict all the other medical testimony and literature of the case. Dr. Saris was unable or unwilling to give a foundation to these opinions beyond citing his qualifications, and citing to one's qualifications as the source of reliability is insufficient. There must be a factual and medical basis for his testimony other than "I say so" under Rule 702. *United States v. Gutierrez-Castro,* 805 F. Supp. 2d 1218, 1227 (D.N.M. Aug. 19, 2011) ("A court is not required to 'admit opinion evidence that is connected to existing data by the ipse dixit of the expert.'") (citing *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)). Without more, Defendants have

not met their burden of establishing the admissibility of their expert's testimony and Plaintiffs

respectfully request that Dr. Saris be prohibited from offering them to the jury at trial.

## ARGUMENT

Federal Rule of Evidence 702 permits the testimony of an expert witness, provided that:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"In its gatekeeper role, a court must assess the reasoning and methodology underlying an

expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of

the case, *i.e.*, whether it is helpful to the trier of fact." *Rawers v. United States*, 545 F. Supp. 3d

1087, 1126 (D.N.M. 2021) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95

(1993)).  Part of the analysis under the *Daubert* standard is for the District Court to weigh

"whether the witness' conclusion represents an 'unfounded extrapolation' from the data; whether

the witness has adequately accounted for alternative explanations for the effect at issue; whether

the opinion was reached for purposes of litigation or as the result of independent studies; or

whether it unduly relies on anecdotal evidence." *Rawers*, 545 F. Supp. 3d at 1126.  In other

words, the District Court must be satisfied that the expert's opinion has a "reliable basis" before

allowing it to reach the jury.  *See id.* at 1126-27 (internal quotation marks and citations omitted).

"A court is not required 'to admit opinion evidence that is connected to existing data only

by the ipse dixit of the expert.  The court may conclude that there is simply too great an

analytical gap between the data and the opinion proffered.'" *United States v. Harry*, 20 F. Supp.

3d 1196, 1225 (D.N.M. 2014) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  As

the New Mexico Court of Appeals explained, "[a]n expert witness must be able to give a

satisfactory explanation as to how he arrives at his opinion." *Galvan v. City of Albuquerque*, 85

N.M. 42, 508 P.2d 1339 (Ct. App. 1973) (explaining that the results of unexplained "tests"

performed by an offered expert did not constitute competent evidence, thus precluding the expert

from offering his opinion).  This requires a sufficiently comprehensive, well-explained, well-

supported, and reliable explanation of his/her opinion that satisfies the Court that the testimony

would meaningfully assist the jury in applying the facts of the case to the law.  *See id.*

### I. DR. SARIS'S OPINION ABOUT THE UNCERTAINTY OF THE EFFECT OF OXYGEN DEPRIVATION ON THE BRAIN IS ANECDOTAL AND LACKS A RELIABLE BASIS

Plaintiffs' claims against the Centurion Defendants are that they did not send Tyler

Wheeler to the hospital when it was apparent he had a worsening brain injury, and the delay in

sending him to the hospital resulted in brain damage, particularly, dead brain tissue (infarcts)

from lack of blood flow and oxygen.  As cited above, all the non-party medical providers agree

that brain bleeds cause increased intracranial pressure, and this increased pressure deprives the

brain of blood and oxygen that it needs to service. As a result, brain cells start to die, and they

die within minutes of being deprived of oxygen. Once the brain cells die, they generally do not

regenerate and devastating damage may occur, sometimes resulting in physical, cognitive and

mental disability.  Based on this agreed upon medical truth – more brain dies the longer it is

deprived of oxygen – Plaintiff asserts that Tyler Wheeler suffered additional brain damage that

he would not have suffered had the Centurion Defendants sent him to the hospital when he had

the first signs of a potential brain injury.

To counter these claims, Dr. Saris, the neurosurgeon expert for Defendants, intends to testify that time did not matter in Mr. Wheeler's case and made no difference in his outcome. He repeatedly testified that the delay in obtaining surgery did not make a difference in Tyler Wheeler's outcome even though he admits that Tyler Wheeler had dead brain tissue, and admits that more and more brain tissue is damaged when actively bleeding epidural hematoma remains untreated. [**Doc. 258-1**, Depo. Saris, 101:16-102:23]. Part of his opinion is based on his assertion that brain cells can live "minutes to hours" without oxygen. [*Id.* at 24:23–25:4]. Although he is a neurosurgeon, when asked "do you know how long a brain cell will live without oxygen," he testified "No idea." [*Id.* at 24:20-22]. When shown literature from the American Academy of Neurosurgeons, of which he is a member, stating that brain cells die within minutes, he first agreed with the statement, and then stated, "I actually don't know how many minutes, but minutes to hours is the best I can do." [*Id.* at 29:10-24].

Given other non-party medical providers' testimony and the literature stating that cells die within minutes without oxygen, Plaintiff's counsel asked Dr. Saris for his support for this contention that cell can live minutes to hours, and he stated "Education, training, experience." [*Id.* at 114:21-117:22]. Plaintiff's counsel asked Dr. Saris what experience he had where a patient had brain cells live when being deprived of oxygen for an hour. *Id*. He did not know. *Id*. Plaintiff's counsel asked Dr. Saris what medical literature he was relying upon to support his opinions. He stated, "I don't know." *Id*. He stated that he encountered sometime in medical school 40 years ago. *Id*. When asked to explain the findings the Tyler Wheeler had dead brain tissue (infarcts), Dr. Saris testified "Yeah, that's a good question. I have no idea." [*Id.* at 92:15-18].

Since Dr. Saris does not know and cannot cite medical literature or experience supporting his contention that brain cells can live for hours without oxygen, he should be prohibited from providing this testimony. This is particularly true given testimony and literature demonstrating that Dr. Saris' opinion is not common sense or recognized by his fellow professionals. While Dr. Saris is qualified to testify in the field of neurosurgery, his ipse dixit opinion that a person could potentially avoid brain damage after being deprived of oxygen for an hour or more should not reach the jury.  Not only does it contradict the common-sense explanation of the American Association of Neurological Surgeons and of two other expert witnesses in this matter, Dr. Saris admits that he has no medical literature to back up his position.  Being a qualified to testify as an expert does not give one carte blanche to say whatever he feels like saying; rather, it must be backed up by some modicum of support.  Because Dr. Saris has not, and cannot, come forward with any peer-reviewed support to vouch for his opinion that a human being can be deprived of oxygen for over an hour and come away unscathed, he must not be permitted to offer any such theory to the jury at trial.

## II.    DR. SARIS'S OPINION ABOUT THE TIMING OF TYLER WHEELER'S ARTERIAL BLEED IN HIS BRAIN LACKS A RELIABLE BASIS

There is no dispute that Tyler Wheeler sustained a traumatic fracture of his skull and that a fragment of his skull cut open an artery in his brain. [**Doc. 258-1,** Depo. Dr. Santos, 62:10 – 63:7]. There is no dispute that the cut artery caused a hematoma to form, which ultimately caused Tyler Wheeler to sustain permanent brain damage.  [*Id.*].

Yet, as part of his expert testimony, Dr. Saris intends to try to convince the jury that the artery was not cut for more than an hour after the traumatic fracture. The intent behind Dr. Saris's opinion about the timing of the opening of Tyler Wheeler's artery appears to be to close the window of time within which reasonable medical providers should have taken action to get

Tyler Wheeler to the hospital.  Dr. Saris agrees that the trauma to Tyler Wheeler's head occurred "at a quarter of 8:00"; yet, he intends to try to convince the jury that "the artery opened up and caused his rapid decline" sometime between 9:00 pm and 10:00 pm.  [**Doc. 258-2**, Dr. Saris Depo., 95:9-17].  Dr. Saris explained that his opinion was based "[b]eing a neurosurgeon for 40 years" but admitted that he was "really confident you would not find an article in the medical literature" to support his opinion.  [*Id.* at 95:18-21]  Dr. Saris admitted that no trauma occurred between 9:00 pm and 10:00 pm and admitted that he had "[n]o idea" why it would have opened up at that time.  [*Id.*]  Dr. Saris admitted that the rupture of the artery was not "spontaneous" and that it was "related to his altercation and his beating by the other inmate," which occurred at about 7:45 pm. [*Id.* at 118:7-18]  Finally, Dr. Saris admitted as follows, "It could have started at, you know, 8:20 versus 8:50 versus 9:20 versus 9:53.  I have no idea."  [*Id.* at 118:19-20].

Like Dr. Saris's inadmissible opinion about a person being deprived oxygen for an hour or more and coming away unscathed, his opinion about the timing of the rupture of Tyler Wheeler's artery is an ipse dixit opinion that lacks a sufficiently reliable basis.  Not only does Dr. Saris admit that no medical literature supports his opinion, but he concedes that the damage to the artery was caused by the traumatic event that occurred at 7:45 pm, not some spontaneous rupture that occurred more than an hour later.  The lack of a reliable basis is proven by Dr. Saris' own testimony:

"Q: Okay, so what caused it to open up between 9:00 and 10:00?

A: No idea." [*Id.* at 119:6-8]

If the expert has no way to explain his theory, that theory should not reach the jury.

**CONCLUSION**

Given the unreliable foundation of the opinions outlined above, Plaintiffs respectfully request that Dr. Saris be from attempting to convince the jury at trial that (1) the human brain can avoid permanent damage in a state of oxygen deprivation over a period of "minutes to hours" or (2) the artery in Tyler Wheeler's brain that was cut open by a fragment of his skull did not "open up" until at least an hour after the trauma that caused the skull fracture occurred.

Date:  January 22, 2024          **Respectfully submitted:**

                                 */s/ Tyler J. Atkins*
                                 Tyler J. Atkins
                                 Samuel H. Walker
                                 Atkins & Walker Law
                                 127 Bryn Mawr Dr. SE
                                 Albuquerque, NM 87106
                                 P: 505-508-4640
                                 E: sam@atkinswalker.com

                                 **Kari E. Brandenburg**
                                 Brandenburg Law
                                 1500 Mountain Road NW
                                 Albuquerque, NM 87104
                                 P: 505-842-1003
                                 E: kariblaw@gmail.com

                                 **Mark Dinelli**
                                 The Dinelli Law Firm, LLC
                                 503 Slate Ave NW
                                 Albuquerque, NM 87102
                                 P: 505-582-2157
                                 E: mark@dinellilaw.com

                                 *Attorneys for Plaintiffs*


**CERTIFICATE OF SERVICE**

I hereby certify that on January 22, 2024, I filed and caused to be served the foregoing through the Odyssey Electronic Filing System on all counsel of record.

*/s/ Tyler J. Atkins*
Tyler J. Atkins