IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


MICHAEL D'ANTONIO, as the plenary conservator
and next friend of TYLER WHEELER, and NIKKI
LAWRIE, as the guardian and next friend of A.W.,
a minor;

   Plaintiffs,

v.          No. 1:21-cv-01027-JB-GBW

NEW MEXICO CORRECTIONS DEPARTMENT;
CENTENE CORPORATION; MHM HEALTH
PROFESSIONS, LLC; CENTURION
CORRECTIONAL HEALTHCARE OF NEW MEXICO, LLC;
DAVID UDERO; NATALIA HUDSON, R.N.;
SHERI PIERCE, H.S.A; and
JOSE G. ANDRADE-BARRAZA, M.D.;

   Defendants.



VIDEO DEPOSITION OF STEPHEN C. SARIS, M.D.


October 10, 2023
11:02 a.m.
Via Zoom Conferencing




PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this Deposition was:

TAKEN BY:  SAMUEL H. WALKER, ESQ.
   ATTORNEY FOR PLAINTIFF MICHAEL D'ANTONIO


REPORTED BY:  MELISSA GOODSON, RPR, CCR #410
   WILLIAMS & ASSOCIATES, LLC
   317 Commercial Street, Northeast
   Suite G-101
   Albuquerque, New Mexico  87102

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 2

    A P P E A R A N C E S
      (All Via Zoom)

For the Plaintiff Michael D' Antonio:
  ATKINS & WALKER LAW
    127 Bryn Mawr Driver, Southeast
    Albuquerque, New Mexico 87106
    (505) 508-4640
    sam@atkinswalker.com
  By:  Samuel H. Walker, Esq.

  THE DINELLI LAW FIRM, LLC
    503 Slate Avenue, Northwest
    Albuquerque, New Mexico 87102
    (505) 582-2157
    mark@dinellilaw.com
  By: Mark Dinelli, Esq.
  BRANDENBURG LAW
    1500 Mountain Road, Northwest
    Albuquerque, New Mexico 87104
    (505) 842-1003
    kariblaw@gmail.com
  By: Kari E. Brandenburg, Esq.

For the Plaintiff Nikki Lawrie:
  MARTINEZ, HART, SANCHEZ & ROMERO, P.C.
    1801 Rio Grande Boulevard, Northwest
    Albuquerque, New Mexico 87104
    (505) 343-1776
    julior@osolawfirm.com
    kellys@osolawfirm.com
  By:  Julio C. Romero, Esq.
    Kelly Stout Sanchez, Esq.
    F. Michael Hart, Esq.

Page 3

    A P P E A R A N C E S
      (All Via Zoom)

For the State of New Mexico Defendants:
  ORTIZ & ZAMORA ATTORNEYS AT LAW, LLC
    530 Harkle Road
    Suite B
    Santa Fe, New Mexico  87505
    (505) 986-2900
    tony@ortiz-zamora.com
  By: Tony F. Ortiz, Esq.

For the Defendants Centurion Correctional Healthcare
of New Mexico, LLC; MHM Health Professionals, LLC;
Jose Andrade, M.D.; Natalia Hudson, R.N.; and Sheri
Pierce, H.S.A.:
  PARK & ASSOCIATES, LLC
    3840 Masthead Street, Northeast
    Albuquerque, New Mexico  87109
    (505) 246-2805
    apark@parklawnm.com
  By:  Alfred A. Park, Esq.

Also Present:
  Michael Henry, Moir Litigation Video, LLC

Page 4

    I N D E X
EXAMINATION OF STEPHEN C. SARIS, M.D.         PAGE

  By Mr. Walker            6
  By Mr. Ortiz            120
  By Mr. Park            121
  By Mr. Walker            129
  By Mr. Ortiz            131

EXHIBITS MARKED FOR IDENTIFICATION
1  Curriculum Vitae            7
2  AANS Web Page - TBI            9
3  AANS Web Page - Stroke            27
4  Expert Report            32
5  Hudson Note, Version One            44
6  Hudson Note, Version Two            45
7  Photograph            55
8  Gabriel Guzman Deposition            58
9  Angelica Benavidez Deposition            70
10 Dr. Andrade's Order            73
11 MRI Scan            91
12 Operative Report            93
13 Advanced Trauma Life Support            103

REPORTER'S CERTIFICATE            134
SIGNATURE/CORRECTION PAGE            136

Page 5

    THE VIDEOGRAPHER:  Good morning.  Today
is the 10th of October, 2023.  The time is 11:02 a.m.
We're on the record.
    My name is Michael Henry of Moir
Litigation Video located in Albuquerque, New Mexico.
The court reporter is Melissa Goodson with Williams &
Associates Court Reporting.  We're here for the
deposition of Stephen C. Saris, M.D., in the case of
Michael D'Antonio versus New Mexico Corrections
Department, et al., filed in the United States
District Court for the District of New Mexico, Case
Number 1:21-cv-01027-JB-GBW.
    Counsel, will you please state your
appearances for the record, and please stipulate that
the court reporter may swear in the witness remotely
by Zoom.
    MR. WALKER:  Sam Walker and Kari
Brandenburg on behalf of Plaintiff Michael D'Antonio,
and we stipulate to the witness being sworn in via
Zoom.
    MR. ROMERO:  Julio Romero, Kelly Stout
Sanchez, and Mike Hart on behalf of Plaintiff Nikki
Lawrie as the guardian next friend of A.W., a minor,
and we stipulate to the remote swearing in.
    (Mr. Dinelli joined the deposition.)

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 6

1    MR. PARK: Good morning. Al Park on
2 behalf of the Centurion Defendants, and we so
3 stipulate.
4    MR. ORTIZ: Tony Ortiz on behalf of the
5 State of New Mexico and Defendant David Udero, and we
6 stipulate as well.
7    MR. Walker: Court reporter, for the
8 record, Mark Dinelli is also present for Plaintiff
9 Michael D'Antonio.
10    MR. DINELLI: Good morning, everyone.
11    MR. Walker: Good morning.
12    THE VIDEOGRAPHER: Thank you. Would the
13 court reporter please administer the oath to the
14 witness.
15    STEPHEN C. SARIS, M.D.
16  Having been first duly sworn, testified as follows:
17    EXAMINATION
18 BY MR. WALKER:
19    Q. Morning, Dr. Saris. My name is Sam Walker.
20 I'm going to be taking your deposition today. Okay?
21    **A. I don't know whether to say good morning or**
22 **good afternoon. It's kind of both.**
23    Q. Dr. Saris, can you state your full name for
24 the record?
25    **A. Dr. Stephen Saris.**

Page 7

1    Q. And, Dr. Saris, I'm going to pull up what has
2 been represented as your CV here. I'm going to mark
3 this as Exhibit 1. Let me know when you can see it on
4 your screen.
5    (Exhibit 1 marked for identification.)
6    **A. I can see it.**
7    Q. And is this your CV?
8    **A. Yes.**
9    Q. All right. And my understanding is that you
10 are a neurologist?
11    **A. No. I'm a neurosurgeon.**
12    Q. I'm sorry, a neurosurgeon. And how long have
13 you been practicing?
14    **A. Over 40 years.**
15    Q. And I thought I saw somewhere that you are
16 board certified by the American Association of
17 Neurological Surgeons; is that right?
18    **A. Yes.**
19    Q. And how long have you been board certified by
20 the American Association of Neurological Surgeons?
21    **A. Since 1988.**
22    Q. And why did you become a member -- oh, are
23 you also a member of the American Association of
24 Neurological Surgeons?
25    **A. Yes.**

Page 8

1    Q. How long have you been a member?
2    **A. Around 40 years.**
3    Q. And why did you become a member?
4    **A. It's pretty standard. Everybody in academics**
5 **has that membership.**
6    Q. Every neurosurgeon has that membership -- in
7 academics?
8    **A. All the ones I know. I'm in a group of about**
9 **25 neurosurgeons at Harvard, and we all have it.**
10    Q. Is it a member-led organization?
11    **A. I don't know.**
12    Q. What's your involvement in the organization?
13    **A. Same as everybody else. I read the journal,**
14 **go to the meetings, interact with other members.**
15    Q. Have you served on any committees?
16    **A. No.**
17    Q. You understand that -- and I'm just going to
18 say it as AANS. Is that all right with you?
19    **A. Sure.**
20    Q. You understand that AANS provides educational
21 services, right?
22    **A. Yes.**
23    Q. And it provides publications, correct?
24    **A. Yes.**
25    Q. Are you familiar with their website?

Page 9

1    **A. I go on there once or twice a year.**
2    Q. And you understand that on their website,
3 they publish information on neurological conditions
4 and neurosurgical issues?
5    **A. Sure.**
6    Q. I'm going to go ahead and mark this as
7 Exhibit 2. Let me know when you can see it.
8    (Exhibit 2 marked for identification.)
9    **A. Got it.**
10    Q. Is this the American Association of
11 Neurological Surgeons website?
12    **A. Yes.**
13    Q. And can you see the topic here listed for
14 this web page?
15    **A. Yes.**
16    Q. And what is it?
17    **A. It's a web page on traumatic brain injury.**
18    Q. Okay. And I want to go over what the web
19 page for AANS talks about for traumatic brain
20 injuries. Is that okay with you?
21    **A. Sure.**
22    Q. AANS defines a traumatic brain injury as a
23 disruption in the normal function of the brain that
24 can be caused by a blow, bump, or jolt to the head,
25 the head suddenly or violently hitting an object or

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 10

1  when an object pierces the skull and enters the brain
2  tissue. Do you see that definition?
3      **A. Yes.**
4      Q. Do you disagree with that definition?
5      **A. Well, let's have a look. A lot of these**
6  **things, I agree with, and a lot of these things, I**
7  **disagree with, so let's have a look. That's pretty**
8  **standard, the first line about disruption in the**
9  **normal function; a bump, blow, or jolt to the head;**
10 **hitting an object. I agree with the statement that**
11 **you've backlit in yellow.**
12     Q. And this is a group that you're a part of,
13 correct?
14     **A. Once again, please.**
15     Q. This is an association that you're a part of?
16     **A. Yes.**
17     Q. And all -- all the academics you know are a
18 part of this association?
19     **A. Yes.**
20     Q. And this is a publication from this
21 association?
22     **A. It depends on what you mean by a publication.**
23 **To a doctor, a publication means a piece of scientific**
24 **work that you submit for review. Using that**
25 **definition, this is not a publication. This is just a**

---

Page 11

1  **kind of -- I don't know -- dissemination of someone's**
2  **opinion on traumatic brain injury.**
3      Q. All right. Well, the AANS, they also have
4  that "Observing one of the following clinical signs
5  constitutes alteration in the normal brain function:"
6  and they have, "Loss of or decreased consciousness;
7  Loss of memory for events before or after the event;
8  Focal neurological deficits as -- such as muscle
9  weakness, loss of vision, change in speech"; and then
10 "Alteration in mental state such as disorientation,
11 slow thinking or difficulty concentrating."
12     Do you see that --
13     **A. I agree with all of those bullet points.**
14     Q. Okay. I want to scroll down to where it
15 talks about symptoms of a head injury. Do you see
16 that section called "Symptoms"?
17     **A. Yes.**
18     Q. And it says, "Symptoms vary greatly depending
19 on the severity," and, "They may include any of the
20 following," and it lists several symptoms; is that
21 right?
22     **A. Yes, about 20.**
23     Q. And on that list, there's vomiting, correct?
24     **A. True.**
25     Q. Lethargy?

---

Page 12

1      **A. True.**
2      Q. Headache?
3      **A. Yep.**
4      Q. Confusion?
5      **A. Yep.**
6      Q. Paralysis?
7      **A. Yep.**
8      Q. Loss of consciousness is on there?
9      **A. Yes.**
10     Q. Slow breathing rate with an increased blood
11 pressure?
12     **A. Yes.**
13     Q. It also has, I believe, dizziness and balance
14 concerns?
15     **A. Yes.**
16     Q. And cerebrospinal fluid appears from the ears
17 or nose. Is that one of the symptoms listed?
18     **A. Yes.**
19     Q. And inappropriate emotional responses --
20     **A. Yes.**
21     Q. -- do you see that? And then speech
22 difficulties?
23     **A. Yes.**
24     Q. Do you agree that those are all symptoms of a
25 head injury?

---

Page 13

1      **A. Yes. If you have a traumatic brain injury,**
2  **some of those, you have, and some of those, you don't.**
3      Q. And then it says at the bottom, "If a TBI is
4  suspected, call 911 immediately or take the person to
5  an emergency room"?
6      **A. Correct. But, again, in context. This is --**
7  **this is a lay -- this is for a layperson, not for a**
8  **neurosurgeon or a healthcare provider.**
9      Q. So you're saying if you're a medical
10 provider, if you suspect a TBI, you should not call
11 911 or take a person to the emergency room?
12     **A. Correct. It depends. If I'm -- if I'm with**
13 **somebody, it could be on a football field or**
14 **wherever, sometimes, yes, sometimes, no. It depends.**
15     Q. It depends with a traumatic brain injury
16 whether you call 911 and send them to the hospital?
17     **A. Yes. It's my decision whether they go to the**
18 **hospital or whether they stay under observation or**
19 **whether they need any surveillance at all. That's my**
20 **decision.**
21     Q. Now, you understand that your testimony is on
22 behalf of the correctional facility, correct?
23     **A. Once again, please.**
24     Q. You understand you're testifying on behalf
25 of -- well, a medical provider at a correctional

---

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 14

1  facility?
2      A. No, that's incorrect. I've been retained by
3  them to offer expert witness.
4      Q. Okay. I appreciate that clarification. You
5  understand that the correctional facility at issue is
6  Southern New Mexico Correctional Facility?
7      A. Yes.
8      Q. And you understand that there was not a
9  physician physically present at that facility on
10  November 10, 2018, for the time frame we're talking
11  about?
12      A. Correct.
13      Q. And you understand that the only provider
14  available was -- available was a registered nurse?
15      A. Understood.
16      Q. And you understand that there was no imaging
17  available at this facility?
18      A. Understood.
19      Q. And you understand that there was no surgical
20  capabilities at this facility?
21      A. Understood.
22      Q. And you understand that there was no one at
23  the facility who could diagnose and treat a traumatic
24  brain injury at that facility?
25      A. That one, if it was felt to be a minimal

Page 15

1  traumatic brain injury, it's something a nurse could
2  keep under observation. And -- but if it was a
3  serious injury, particularly an epidural hematoma,
4  that has to go to the closest hospital that has a
5  neurosurgeon available.
6      Q. How would a nurse diagnose whether it's a
7  epidural hematoma or a mild traumatic injury if
8  there's no CT available?
9      A. Well, they're quite different. An epidural
10  hematoma causes what happened to Mr. Wheeler, which is
11  rapid decline into unconsciousness.
12      Q. So that's the only way you can diagnose an
13  epidural hematoma, is if they decline?
14      A. No. That usually happens, not always.
15      Q. You could get a CT scan?
16      A. Not at the correctional institution. That
17  would more be available at a nearby hospital.
18      Q. Okay. So the only way for a patient in this
19  context to get a CT scan is to go to the hospital,
20  right?
21      A. Agreed.
22      Q. And the only way for this patient to receive
23  a neurosurgical consult is to go to the hospital,
24  correct?
25      A. Yes.

Page 16

1      Q. And you understand the only way a patient can
2  receive surgical treatment is to go to the hospital,
3  correct?
4      A. True.
5      Q. And I think we already established this, but
6  we -- you're providing neurological expertise in this
7  case?
8      A. Again, neurology and neurosurgery are quite
9  different. This is neurosurgical expertise. But in
10  fairness, the long-term care, and even the short-term
11  care, of traumatic brain injuries is an overlap area,
12  and both neurosurgeons and neurologists can opine on
13  the matter.
14      Q. And do you agree that Tyler Wheeler suffered
15  a skull fracture? Correct?
16      A. Yes.
17      Q. And that that skull fracture led to a brain
18  bleed?
19      A. Interesting question. No. It was probably
20  the -- the general trauma to the head, moving back and
21  forth, that caused a vessel on the surface of the
22  brain to tear that, in turn, caused the internal
23  bleeding. Probably the skull fracture was also caused
24  by the altercation, but was not the direct cause of
25  the bleeding.

Page 17

1      Q. Okay. So your testimony is that the skull
2  fracture did not cause torn arteries?
3          MR. ORTIZ: Objection, form.
4      A. Pardon me?
5      Q. Your testimony is that the skull fracture did
6  not cause the torn arteries in Tyler Wheeler's head?
7          MR. ORTIZ: Objection, form.
8      A. That's an interesting question. It cannot be
9  said, to a more likely than not probability, whether
10  the skull fracture caused the bleeding or whether the
11  skull fracture did not cause the bleeding. Either is
12  possible.
13      Q. All right. So what is your testimony exactly
14  on that issue?
15      A. That a blood vessel on the surface of the
16  brain broke as a result of the altercation, that
17  caused the internal bleeding, that caused him to be so
18  severely brain damaged.
19      Q. Can you tell me, then -- so you're not going
20  to sit there and say whether or not the skull fracture
21  caused the brain bleeding or if it was the shaking,
22  the movement of his brain, that caused the --
23      A. Correct, it cannot be said --
24          MR. ORTIZ: Objection, form.
25      A. It cannot be said to a more likely than not

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.                          Stephen C. Saris, M.D.
No. 1:21-CV-01027-JB-GBW                                           October 10, 2023

Page 18

1  probability that either the skull fracture caused the
2  bleeding or the skull fracture just happened at the
3  same time as the bleeding.
4      Q. And you're -- so I -- for clarity, you're not
5  taking a position either way, are you?
6      A. Correct.
7      Q. Okay. So he did have bleeding in his brain,
8  though, correct?
9      A. I don't want to seem --
10     Q. No, go ahead. I --
11     A. -- but it's not in the brain. It's -- it's
12  between the outer surface of the brain and the skull.
13  So an epidural hematoma is actually outside the brain.
14     Q. Understood. Within his skull, though, he is
15  having a bleed?
16     A. Agreed.
17     Q. Okay. And this bleeding is called -- an
18  epidural hematoma is what he developed, correct?
19     A. Agreed.
20     Q. And this epidural hematoma in Tyler Wheeler's
21  case -- case was causing increased intracranial
22  pressure?
23     A. Yes.
24     Q. And this is because the skull is a fixed
25  space, correct?

Page 19

1      A. True.
2      Q. So as the blood fills in the skull, there's
3  less space for the brain?
4      A. Yes.
5      Q. And that pressure that's building pushes on
6  the brain inside the skull?
7      A. Agreed.
8      Q. And when it pushes on the skull, that's what
9  leads to Tyler Wheeler suffering a midline shift,
10  correct?
11     A. Yes.
12     Q. And that's what leads to him suffering an
13  uncal herniation, correct?
14     A. Yes.
15     Q. And just to make sure I'm correct on this
16  midline shift, that's the center of your brain and
17  when your brain is being pushed off center, correct?
18     A. Yeah, it's kind of -- the left side of the
19  brain is pushed into the right side of the head.
20     Q. And my understanding of an uncal herniation,
21  is there's actually downward pressure that's causing
22  part of the brain to transverse into this uncal part,
23  or the -- or into a different compartment in the
24  brain?
25     A. Yeah, the brain is pushed downwards, so

Page 20

1  it's -- it's -- you're trying to push a size 8 foot
2  into a size 6 shoe, basically. And as a result of
3  that, the center of the brain is damaged. As a result
4  of that, you know, you either die or become
5  vegetative.
6      Q. So my understanding, then, is Tyler Wheeler
7  was experiencing both pressure laterally and downward
8  from his epidural hematoma?
9      A. Agreed, as a result of which, the center of
10  his brain was severely damaged.
11     Q. And I -- from what I've read there are
12  specific symptoms for someone with an impending uncal
13  herniation. Would you agree with that?
14     A. That's a tough one, because, you know, when a
15  doctor uses the word "symptom," it means something
16  that the patient is describing to the doctor. In
17  general, somebody that sick is unconscious, so they
18  cannot have symptoms.
19     Q. Would you say signs then? What -- what word
20  would you like me to use for when a provider is
21  looking at a patient and seeing signs of a condition,
22  or symptoms?
23     A. Yes, so -- so you bring up, you know, an
24  important point. A sign, as you say, is something a
25  doctor sees on physical examination of the patient,

Page 21

1  and the most important one for herniation is that the
2  pupil on one or both sides gets large and just stays
3  there. It does not respond to light.
4      Q. Okay. So you do not agree, then, that
5  headache is a sign or a symptom of an impending uncal
6  herniation?
7      A. Correct. Headache is too general a symptom
8  to be of much use.
9      Q. Okay. And you do not agree that nausea is a
10  sign or a symptom of an impending uncal herniation?
11     A. Correct. I -- I've covered emergency rooms
12  for thousands of days and nights. I've seen well over
13  a thousand patients who are in fights, and similar to
14  headaches, nausea is -- is too general a term, too
15  common a -- a symptom to be of use.
16     Q. How about vomiting? Is that a sign of an
17  impending uncal herniation?
18     A. Again, it's really common with serious and
19  not serious head injuries. It's -- it's too common
20  and nonspecific to be of use.
21     Q. Okay. And what about altered mental status?
22     A. Yeah, altered mental status has my attention.
23  In medicine, the levels of consciousness are alert,
24  sleepy, stuporous, and comatose. And sleepy has my
25  attention. It's somebody I would surveil more

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 22

1  closely.  Stuporous and comatose, you're unconscious,
2  and that has my full attention.
3      Q.  Would you agree that increased intracranial
4  pressure, when there's an epidural hematoma, will
5  cause -- will cut off blood flow to certain parts of
6  the brain?
7      A.  I actually don't know.  It's an interesting
8  question.  What I do know is that it causes
9  herniation.  That, in turn, causes severe brain
10  damage.
11      Q.  So you don't believe that when you have in-
12  -- when your brain is shifting over that the    pres-
13  -- the brain doesn't get -- blood flow doesn't get cut
14  off?
15      A.  Yeah, I don't know the answer to that
16  question.
17      Q.  So why does it cause -- why does it cause
18  brain damage when you have a midline shift?
19      A.  Well, it's -- again, you're trying to force a
20  size 9 foot into a size 7 shoe, and when that -- when
21  that size 9 foot is the brain, it gets damaged.  The
22  central part of it gets damaged, and then you sink
23  into a coma, as a result of which, you either die or
24  end up in a vegetative state.
25      Q.  And what do you die from?

Page 23

1      A.  Brain damage.
2      Q.  And what, specifically, type of brain damage?
3      A.  The part of the brain that controls blood
4  pressure, the kind of -- the part of the brain that
5  tells you to breathe.  They just all shut down, and
6  you die.
7      Q.  And why do they shut down?
8      A.  Because they've been squished because of the
9  herniation.
10      Q.  And why does squishing cause them to shut
11  down?
12      A.  Well, if you -- if you compress any part of
13  the body enough, you're going to damage it, and it's
14  going to stop working, and that applies to the brain
15  as well.
16      Q.  And why does it stop working when you squish
17  it?
18      A.  Yeah, I can't go beyond that.  When -- when
19  you -- when you severely squeeze any part of the body,
20  at some point, you're going to damage it beyond the
21  point that it functions.
22      Q.  So you --
23      A.  That's why medicine --
24      Q.  -- can't say why --
25      A.  Pardon me?

Page 24

1      Q.  I'm sorry.  You can't say why squishing it
2  causes dysfunction in itself?
3      A.  I cannot.  It's an interesting question, but
4  I cannot answer it.
5      Q.  Do you agree that blood cells need oxygen?
6      A.  Yes.
7      Q.  Do you agree that blood cells receive oxygen
8  from blood?
9      A.  Yes.
10      Q.  Do you agree that a lack of blood flow means
11  that a brain cell is not getting oxygen?
12      A.  Yes.
13      Q.  And do you agree that no oxygen means a brain
14  cell will die?
15      A.  No, I disagree with that.  I mean, it depends
16  for how long they've been deprived of oxygen.  If it's
17  a tenth of a second, you're good.  If it's three
18  hours, you're not good.  I'm not sure where the red
19  line is between those two.
20      Q.  Do you -- do you know how long a brain cell
21  will live without oxygen?
22      A.  No idea.
23      Q.  How long will the brain survive without
24  oxygen?
25      A.  Another interesting question.  You know,

Page 25

1  doctors deal in -- not so much in specific times, like
2  1.3 seconds.  We deal with seconds to minutes, minutes
3  to hours, hours to days.  So in minutes to hours, if
4  your brain is deprived of oxygen, you're dead.
5      Q.  Okay.  Will you -- can you survive ten
6  minutes without oxygen?  Can your brain survive ten
7  minutes without oxygen?
8      A.  Yeah, it's another interesting question to
9  which my answer is:  I don't know.  It's -- it's --
10  it's minutes to hours.  Beyond -- you know, less than
11  a day.  As -- as to where that red line is between
12  minutes and -- minutes and a day, I just don't know.
13      Q.  Can your brain live an hour without oxygen?
14      A.  You've -- you've already asked that.  My
15  answer will continue to be:  I don't know.
16      Q.  So you -- if you cut off blood flow to the
17  brain, you're saying it can live for more than an
18  hour?
19      A.  Yeah, it depends on the cell.  I mean,
20  some -- some cells are remarkably resistant to
21  deprivation of oxygen.  But I -- I -- I don't know the
22  literature on how long a stomach cell versus a brain
23  cell versus a heart cell will last without oxygen.
24  It's -- it's distributed over a bell curve, like most
25  things.

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 26

1    Q. You're a neurosurgeon, correct?
2    **A. Yeah, yes.**
3    Q. And you were never trained on how long a
4 brain cell can live without oxygen?
5    **A. Correct. Yeah, there's no specific training**
6 **in that for a neurosurgeon. That's not what we do.**
7    Q. Okay. So when you're doing neurosurgery, can
8 you stop blood flow to the brain and expect the
9 patient to be okay?
10    **A. Oh, yes, we -- we -- you know, doing --**
11 **there -- there's a whole area of aneurysms where**
12 **you -- you put the patient into cardiopulmonary arrest**
13 **and -- and deal with the aneurysm. Yeah, so in answer**
14 **to your question, like how -- how many minutes? Is --**
15 **is it minutes? An hour? An hour and a half? I just**
16 **don't know. But at some point when -- when a cell is**
17 **deprived of oxygen, it dies.**
18    Q. Have you ever heard the phrase, "time is
19 brain"?
20    **A. Once again, please.**
21    Q. Have you ever heard the phrase, "time is
22 brain"?
23    **A. Time is brain?**
24    Q. Yeah.
25    **A. No.**

---

Page 27

1    **I don't know if you want to come off that web**
2 **page or continue in this manner.**
3    Q. It doesn't matter to me.
4    **A. Oh, okay.**
5    Q. Okay. I'm going to, again -- I think we're
6 on Exhibit --
7        THE REPORTER: 3.
8    Q. -- 3. All right.
9    (Exhibit 3 marked for identification.)
10    Q. Well, let me ask this: Doctor, do you treat
11 patients who have suffered strokes?
12    **A. No, that's generally in neurology. There is**
13 **a small overlap, but that's mostly neurology.**
14    Q. So you have no experience with strokes?
15    **A. I have a -- neurosurgeons get involved in the**
16 **early phases of strokes, like -- like an intracerebral**
17 **hemorrhage, but the vast majority of their care is by**
18 **neurology.**
19    Q. Do you have knowledge and experience on
20 strokes?
21    **A. Yes.**
22    Q. You're -- if you were at a hospital, you're
23 licensed to treat people with strokes, correct?
24    **A. It depends. There are many different kinds**
25 **of stroke some -- some neurosurgeons get involved**

---

Page 28

1 **with. The vast majority are taken care of only by**
2 **neurology.**
3    Q. I'm going to share my screen here. This is
4 from the American Association of Neurological Sur-- --
5 Surgeons. Let me know when you can see it.
6    **A. All set.**
7    Q. Okay. All right. And you can see that this
8 is from the American Association of Neurological
9 Surgeons, correct?
10    **A. Agreed.**
11    Q. This is from their website?
12    **A. Agreed.**
13    Q. All right. And this is talking about
14 strokes --
15    **A. Agreed.**
16    Q. -- correct? And what is a stroke?
17    **A. When a part of the brain dies.**
18    Q. And why is it dying?
19    **A. From a number of reasons. It could be**
20 **penetrating trauma, like a -- like shrapnel. It could**
21 **be a hemorrhage. It could be a number of things.**
22    Q. Let's look at what AANS, the organization of
23 which you're a part of, defines a stroke. It defines
24 a stroke as "an abrupt interruption of constant blood
25 flow to the brain that causes loss of neurological

---

Page 29

1 function." Do you see that?
2    **A. Yes.**
3    Q. And the organization, of which you are a part
4 of, sets -- states that "The interruption of blood
5 flow can cause -- can be caused by a blockage, leading
6 to the more common ischemic stroke, or by bleeding in
7 the brain, leading to the more deadly hemorrhagic
8 stroke," correct?
9    **A. Yes.**
10    Q. And I want to go down to where it says -- the
11 second paragraph where it says, "It is crucial that
12 proper blood flow and oxygen be restored to the brain
13 as soon as possible." Do you see that?
14    **A. Yes.**
15    Q. And it must be restored as soon as possible,
16 because, "Without oxygen and important nutrients, the
17 affected brain cells are either damaged or die within
18 a few minutes."
19    **A. Agreed.**
20    Q. So you agree with that statement?
21    **A. I actually don't know how many minutes, but**
22 **minutes to hours is the best I can do. So it would**
23 **depend what they mean, how many minutes. But minutes**
24 **to hours, I agree with that.**
25    Q. They say within a few minutes?

---

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.                                    Stephen C. Saris, M.D.
No. 1:21-CV-01027-JB-GBW                                                      October 10, 2023

---

Page 30

1    **A. Yeah, I don't agree with everything on the**
2    **site.**
3       Q. So you disagree that the brain will be --
4    brain cells will be damaged or die within a few
5    minutes without -- if they're deprived of oxygen?
6          MR. ORTIZ: Objection, form.
7       **A. Like most things in medicine, it depends. It**
8    **depends -- it depends how diminished the blood flow**
9    **is. It depends what part of the brain. It just**
10   **depends on a lot of things. So we -- we can agree**
11   **that minutes to hours after a decrease in oxygen**
12   **supply, the brain will die, but it depends on the**
13   **situation. And in that, I disagree with the statement**
14   **on that screen.**
15      Q. Okay. Dr. Saris, do you rely on any
16   textbooks or any -- what do you consider an
17   authoritative source for neurosurgical care?
18      **A. Nothing. Mostly my education, training, and**
19   **experience.**
20      Q. You don't think any textbook out there on
21   neurosurgery is authoritative?
22      **A. I agree. No -- no textbook is authoritative.**
23   **When you look at any of the common neurosurgery**
24   **textbooks, they're authored by dozens and dozens of**
25   **individuals. Some, I agree with. Some, I don't.**

Page 31

1       Q. What about any reference sources?
2       **A. It's the same thing. The -- you know, in**
3    **neurosurgery, there are -- there are two main**
4    **journals: Neurosurgery and the Journal of**
5    **Neurosurgery, dozens and dozens of articles each week.**
6    **Some, I agree with. Some, I don't.**
7       Q. So is it your testimony something is
8    authoritative if you agree with it?
9       **A. No, I didn't say that. I didn't say that at**
10   **all. I'm saying that there is no such thing as an**
11   **authoritative text or journal in neurosurgery where**
12   **everything in that publication is the possible truth**
13   **and everybody agrees with it. I state again:**
14   **Sometimes, I agree with it, and sometimes, I don't.**
15      Q. Any textbooks that you would recommend?
16      **A. No.**
17      Q. Any journals that you would recommend?
18      **A. Yeah, Journal of Neurosurgery is pretty good.**
19   **New England Journal of Medicine is pretty good. They**
20   **have a lot of stuff on -- on the nervous system.**
21      Q. Anything else?
22      **A. No. Those are the two big ones, mostly the**
23   **Journal of Neurosurgery.**
24      Q. All right. Let's go ahead and start talking
25   about your opinions. All right. We're going to move

Page 32

1    on to what I'm going to mark as Exhibit --
2          THE REPORTER: 4, 4.
3       Q. -- I think we're on Exhibit --
4       (Exhibit 4 marked for identification.)
5       Q. This is going to be your opinions. All
6    right. Can you see the document, Dr. Saris?
7       **A. Yes.**
8       Q. All right. Let's scroll down here. And then
9    here is Exhibit A. This is -- let's see here. Let's
10   see. I'm looking for where your -- is this the start
11   of your report?
12      **A. Yes, yeah.**
13      Q. Okay. Page 1. Okay. So let's first go to
14   the materials you received, and we've -- you have
15   "Plaintiff's First Amended Complaint," correct?
16      **A. Yes.**
17      Q. David Udero's deposition?
18      **A. Yes.**
19      Q. Gabriel Guzman's deposition?
20      **A. Agreed.**
21      Q. Karen Ramirez's deposition?
22      **A. I reviewed a lot of depositions for this**
23   **case, so, again, agreed.**
24      Q. Jose Andrade's deposition?
25      **A. Yes.**

Page 33

1       Q. Natalia Hudson's deposition?
2       **A. Yes.**
3       Q. Centurion medical records from November 10,
4    2018?
5       **A. Yes.**
6       Q. MountainView Regional medical records?
7       **A. Yes.**
8       Q. Brain scans and radiology reports?
9       **A. Yes.**
10      Q. You reviewed the reports of Dr. Stein,
11   Dr. White, and Nurse Davis?
12      **A. Yes.**
13      Q. Ambulance records?
14      **A. Yes.**
15      Q. And NMCD videos?
16      **A. Yes.**
17      Q. Have you reviewed anything else?
18      **A. I tried to have an -- a list of what the most**
19   **important documents are that I reviewed, and the list**
20   **that you just read from comports with that. That**
21   **said, there may have been -- there may have been a**
22   **handful that I didn't put on there, but those, for**
23   **sure, are the important ones.**
24      Q. Can you tell me what else you reviewed?
25      **A. No.**

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 34

1    Q. I need to know what you reviewed, so can you
2 look on your desktop or whatever and tell me what you
3 reviewed?
4    **A. When I -- when I review a case, I review**
5 **thousands of records. I don't synopsize every single**
6 **one of them. I just synopsize the most important**
7 **ones. So my answer to your question is: I can't**
8 **remember, but the ones that you listed are, for sure,**
9 **the most important ones.**
10    Q. And, Dr. Saris, I'm sorry, I have to be kind
11 of particular about this, but I'm entitled to know
12 what you reviewed. So if you didn't review anything
13 else, I need you to affirmatively say you did not
14 review anything else, or you need to tell me
15 everything you reviewed. And if we need to take a
16 minute for you to do that, we can go off the record,
17 but I need to know what you reviewed.
18    **A. Yeah, I have no way of accessing information**
19 **so that I could answer your question.**
20    Q. What do you mean? Aren't you on a computer?
21    **A. Yes.**
22    Q. Okay. You can't look on your computer to see
23 what you have on there for what you reviewed?
24    **A. No. That's why I made the list that you just**
25 **read from.**

Page 35

1    Q. Why not?
2    **A. I make the list as I -- as I go through the**
3 **medical records, which, in this case, I think was well**
4 **over a thousand pages. So these are the important**
5 **records.**
6    Q. I know. But why can't you tell me what else
7 you reviewed or look it up?
8    **A. Because I have no way of doing it.**
9    Q. Why not?
10    **A. Because I don't have access to that**
11 **information.**
12    Q. Where -- how did you review it in the first
13 place if you didn't have access to it?
14    **A. It's thousands of pages, so I just -- I**
15 **scroll through them one page, one page, one page. So,**
16 **for example, if there's a urinalysis on day 4 of the**
17 **hospitalization, I'll look at that, but I don't**
18 **synopsize it and put it in that list. If I have a**
19 **subpoena, I don't synopsize it and put it on that**
20 **list. So in that -- in those thousands of pages,**
21 **there are a number of documents not on that list that**
22 **I reviewed, but they weren't important enough for me**
23 **to put on that list.**
24    Q. I know, but why can't you -- why don't you
25 have access to them right now?

Page 36

1    MR. ORTIZ: Objection, asked and
2 answered.
3    **A. Yeah, I've asked and answered it, so you can**
4 **ask and answer that -- you can ask me that another**
5 **hundred times. I'm going to give you the same answer.**
6    Q. You haven't told me why -- is it -- why don't
7 you have access to them anymore? You just told me
8 that you don't synopsize them all, but are they not
9 available on your computer any longer? Did you shred
10 the paper records? What happened to the records that
11 you reviewed?
12    **A. No --**
13    MR. PARK: Objection --
14    **A. -- those are not on the computer.**
15    MR. PARK: Objection, form. Sorry.
16    Q. How did you review the records?
17    **A. By -- by -- by scrolling through all the**
18 **records that were provided to me over the past one and**
19 **a half years.**
20    Q. Did you review them on a computer?
21    **A. Yes.**
22    Q. Did you -- so what happened to the files
23 after you reviewed them?
24    **A. They -- they go into this report.**
25    Q. I know. But like what happened to the actual

Page 37

1 file?
2    **A. If you want to ask me about a specific**
3 **document, I'll tell you whether or not I can remember**
4 **reviewing it, but these are, gosh, dozens of the**
5 **documents. These -- these are the most important**
6 **ones. The other ones, I don't have access to. I**
7 **mean, again, to -- for me to synopsize a urinalysis or**
8 **a subpoena or a hematocrit, I mean, it has no**
9 **relevance to the case, so I don't bother putting it on**
10 **that list. Yet that's a document I reviewed.**
11    Q. Okay. I understand what you're saying. I
12 just want to know, did you review any other
13 depositions?
14    **A. Not that I recall.**
15    Q. Did you review any other statements?
16    **A. Not that I recall.**
17    Q. If they were important to your opinions, you
18 would have put them on the list?
19    **A. Yes.**
20    Q. So if they're not on the list, we can assume,
21 then, that they were not important to your opinions?
22    **A. Agreed.**
23    Q. Let's scroll down here. All right. We can
24 delete this.
25    All right. I'd like you to tell me about

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 38

1 this opinion right here.
2     A. Sure.
3     Q. It says in your report -- and this is on --
4 let's see what page of this -- this is page 8 of 19 of
5 your report. It's lines 30 and 31. It says, "It is
6 my opinion that the altercation and head strike on
7 November 10, 2018 from the other inmate caused
8 Mr. Wheeler's epidural hematoma and ultimate brain
9 damage." Is that your --
10     A. Pardon me?
11     Q. Is that your opinion?
12     A. Yes.
13     Q. Okay. And what is that opinion based on?
14     A. Based on the medical records I was provided
15 with.
16     Q. And how did you determine from the medical
17 records that there was a -- that the altercation is
18 what caused the hematoma?
19     A. There are two sources. I was provided with
20 two two-minute videos that showed the altercation, and
21 there are, you know, multiple references to the
22 altercation from both, you know, prison guards,
23 healthcare providers, and so on.
24     Q. Okay. Anything else other than those videos
25 and the medical records that you relied upon?

Page 39

1     A. No.
2     Q. And can you just kind of explain how you
3 reached this conclusion?
4     A. It's common sense as much as medicine. The
5 only records I have are the videos where it shows the
6 altercation and the other, you know, documents that
7 describe the altercation. The intracranial hemorrhage
8 came after the altercation, so it's common sense.
9     Q. So basically the fact that there was an
10 altercation the resulting epidural hematoma,
11 that's how you're drawing the connection between the
12 fight or the hit -- the -- the assault by the other
13 inmate and Tyler Wheeler suffering an epidural
14 hematoma?
15     A. Yes.
16     Q. Nothing else?
17     A. Correct.
18     Q. Now, you reviewed Plaintiff's Amended
19 Complaint, correct?
20     A. If you can tell me which of those documents
21 you were referring to earlier, I can answer your
22 question. But the immediate answer to your question
23 is: Not that I recall.
24     Q. Okay. So you listed it, but you didn't
25 review it?

Page 40

1     A. I said, not that I recall. If you can show
2 me the document you're referring to, I can tell
3 whether or not I reviewed it.
4         MR. PARK: Sam, I don't think he heard
5 what -- the document you referred to.
6         THE WITNESS: Pardon me?
7         MR. PARK: Did you -- Doc, did you hear
8 the document? He -- he asked if you reviewed the
9 Amended Complaint.
10     A. I'd have to go to my -- my own -- I don't
11 have total recall.
12         MR. PARK: Sorry, Sam.
13     A. I've reviewed thousands of pages on this guy.
14 So for you to ask me about the legal document, the
15 Amended Complaint, I don't remember. If you can show
16 me the document, I can tell you whether or not I
17 looked at it.
18     Q. Did you know that Plaintiff had claims
19 against a correctional officer for hitting Tyler
20 Wheeler's head on a concrete floor?
21     A. No.
22     Q. Have you been asked to give opinions about
23 whether the concrete floor -- hitting Tyler Wheeler's
24 head on the concrete floor versus the inmate -- from
25 an assault caused Tyler Wheeler to have an epidural

Page 41

1 hematoma?
2         MR. ORTIZ: Objection, form.
3     A. Yeah, if you could -- the answer is no.
4     Q. So you do not -- you will not testify
5 regarding whether an inmate hitting Tyler Wheeler in
6 the head versus Tyler Wheeler's head getting hit on
7 the concrete floor -- which one of those events caused
8 the epidural hematoma?
9         MR. ORTIZ: Objection, form.
10     A. I don't understand your question.
11     Q. Yeah, I just want to make sure you're not
12 going to give an opinion regarding which event caused
13 Tyler Wheeler's epidural hematoma.
14     A. The only information I --
15         MR. PARK: Objection, form.
16     A. The only information I have at this time is
17 that it was an altercation between two inmates.
18 That's what the documents I reviewed say, and that's
19 what the video indicates.
20     Q. And I just want to make sure. Given that,
21 you're not prepared to give an opinion whether the
22 altercation or Tyler Wheeler's head being hit on a
23 concrete floor caused the epidural hematoma?
24         MR. ORTIZ: Objection, form.
25     A. Correct. I consider that more an area of

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 42

1 forensic pathology or forensic medicine than -- than
2 neurosurgery. I mean, does a punch cause the injury?
3 Does trauma with a concrete floor cause an injury? Do
4 both cause an injury? That's forensic pathology.
5 That's not neurosurgery.
6     Q. So you're not going to testify on these
7 issues?
8     A. Correct.
9     Q. All right. Let's go then to -- oh, I didn't
10 mean to stop sharing. I meant to scroll down.
11         MR. WALKER: You know what? I'm about to
12 go on to a different part of your opinion, and it's
13 going to be kind of -- there's going to be a line of
14 questioning, and since we're getting close now, I
15 think right now is actually -- if we're going to take
16 like a bathroom break -- is probably the best point to
17 do it. So why don't we take a five-minute break, just
18 because I don't want to -- I might go for like an hour
19 on this next line of questioning.
20         THE WITNESS: Sure.
21         MR. PARK: Okay.
22         THE VIDEOGRAPHER: Off the record at
23 11:46 a.m.
24     (Recess taken from 11:46 a.m. to 11:56 a.m.)
25         THE VIDEOGRAPHER: On the record at

---

Page 43

1 11:56 a.m.
2     Q. (By Mr. Walker) All right. Dr. Saris, we're
3 going to talk now about some of your other opinions,
4 so I'm going to go ahead and pull up your report
5 again.
6         All right. I have an opinion here, and we're
7 going to look at this one. It was -- and let me --
8 and just confirm that this is -- this is correct, but
9 it has here -- it says your opinion is, "Mr. Wheeler
10 was awake and interactive between 8 p.m. and 9:10 p.m.
11 on November 10, 2018. At that time, the standard of
12 care required close observation in a clinical
13 setting." Is that your opinion?
14     A. Yes.
15     Q. Okay. All right. And -- all right. So
16 let's go ahead and talk about what you relied upon.
17 It says here in your note -- go back, because we're
18 not actually going to have these highlights in the
19 record in my exhibit I'm going to put in the record --
20 that you looked at Nurse Hudson's progress note in the
21 NMCD chart and the Nurse Hudson depo. Is that what
22 you reviewed -- one of the things you reviewed?
23     A. Yes.
24     Q. Did you know that there were two versions of
25 Nurse Hudson's note?

---

Page 44

1     A. No.
2     Q. Do you know which one you reviewed?
3     A. No.
4     Q. I'm going to go ahead and stop sharing your
5 report, and I'll pull up -- how do I want to do this?
6 All right. I'm going to pull up one version. We'll
7 just call it version one, and then I'll show you
8 version two, and then tell me which one you reviewed.
9 Okay?
10     A. Sure.
11     Q. We're going to mark this -- can you see this?
12 Is it sharing?
13     A. Yes.
14     Q. All right. I think this is Exhibit 5 --
15     (Exhibit 5 marked for identification.)
16         THE REPORTER: It is.
17     Q. -- version one. Okay. Let me -- just let
18 me -- kind of give me some kind of affirmation you've
19 reviewed it and you're comfortable for me to show you
20 the other one.
21     A. I can't remember. Again, I reviewed over
22 2,00- pages of records, so I don't -- I can't
23 remember.
24     Q. Do you want me to show you the other one,
25 too, just so you can kind of get some context?

---

Page 45

1     A. Yes, please.
2     Q. All right. And we'll do version two as
3 Exhibit 6.
4     (Exhibit 6 marked for identification.)
5     Q. All right. Give me a second. Let me know
6 when you can see it.
7     A. I can see it.
8     Q. Okay. Now, looking at version two, does this
9 look like a medical record you reviewed?
10     A. Can't remember.
11     Q. Okay. Do you know if you -- you only
12 reviewed one version, though, correct?
13     A. As best I can recall, yes.
14     Q. And you don't remember there being two
15 versions?
16     A. No.
17     Q. Okay. So what we'll do is, we'll just start
18 looking at version two here, and then we'll look at
19 version one, too. So just so you know, there have
20 been two records provided with the same date and same
21 times. The information, it changes a little bit
22 between the two, so -- but we don't know which one is
23 made more closer in time. At this point in time, we
24 don't.
25     A. Understood.

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 46

1    Q. All right. So in this one, this is version
2 two, Exhibit 6, I want to kind of highlight what Tyler
3 Wheeler's symptoms are. And this is -- this is on
4 November 10, 2018, right?
5    **A. Yes.**
6    Q. And it says 2000 hours, which is 8:00 p.m.,
7 correct?
8    **A. Yes.**
9    Q. Okay. And the subjective says, "Patient
10 complaint being hit blindsided, continuous." Do you
11 see that?
12    **A. Yes.**
13    Q. So we know that Tyler Wheeler, at 8:00 p.m.,
14 has been hit, blindsided continuously -- or
15 continuous?
16    **A. Yes.**
17    Q. All right. And then it goes on to say,
18 "Complaint childish behaviors and how unnecessary this
19 is to fight." Do you know what that means?
20    **A. Yes. How unnecessary it is to fight, he's**
21 **saying that fighting makes no sense.**
22    Q. I know. But do you know like in terms of
23 medical diagnosis, is this pertinent to your
24 evaluation of this matter?
25    **A. Yes.**

---

Page 47

1    Q. Okay. Why is this -- why is him saying it's
2 unnecessary -- how unnecessary it is to fight
3 important to your assessment?
4    **A. Be -- because the most important thing I look**
5 **at as a neurosurgeon is level of consciousness, and**
6 **the fact he can, you know, make this commentary on**
7 **childish behavior and fighting means that he's awake**
8 **and seems okay. In medical, you know, jargon, he's**
9 **alert.**
10    Q. Okay. I'll go ahead and highlight that
11 because we talked about it. All right. And it says,
12 "Patient asked to stop nose bleeding. Patient
13 refusing to answer questions, insists he has no pain
14 and refused to be cleaned up. Instructed to allow his
15 face to be cleaned to access [sic] his injuries."
16        Then it says, "Assessment: Pressure held to
17 bridge of nose to stop bleeding." And, "Noted a
18 superficial cut to the tragus area of his left ear and
19 a superficial cut and a small bump to the left upper
20 forehead by his hairline, no bleeding to that area."
21        So from this record, we know that Tyler
22 Wheeler has bleeding from his nose, correct?
23    **A. Yes.**
24    Q. We know that he has bleeding on his ear?
25    **A. Yes.**

---

Page 48

1    Q. We know there's a bump on his forehead near
2 his hairline?
3    **A. Yes.**
4    Q. And I think it says, "left upper forehead."
5 And anything else about his physical appearance?
6    **A. I don't understand your question.**
7    Q. Yeah. Are there any other things we know
8 about his physical appearance based on this medical
9 record?
10    **A. Not of significance.**
11    Q. All right. And one of the things -- it notes
12 a PERRLA. Do you see that?
13    **A. Yes.**
14    Q. Okay. And what is a PERRLA?
15    **A. Pupils equally round and react to light.**
16 **The -- the pupils are what's really important. It**
17 **says that his pupils are round, and they contract,**
18 **they get smaller, when exposed to a flashlight.**
19    Q. Do you note any kind of neurological exam in
20 this record?
21    **A. That is part of the neurological examination.**
22    Q. What else would be part of a neurological
23 examination?
24    **A. It depends on the context. The fact that**
25 **he's alert and his eyes are okay, that's sufficient in**

---

Page 49

1 this context.
2    Q. You don't think there should be any kind of
3 Glasgow Coma Scale here?
4    **A. No.**
5    Q. You don't think they should test his motor
6 skills here?
7    **A. No.**
8    Q. You don't think they should test if he's
9 having any neurological deficits?
10    **A. They did. I mean, they looked at the**
11 **important things, which is level of consciousness and**
12 **his eyes.**
13    Q. If he had any kind of inability to walk or
14 any inability -- inability to use his hands, that
15 wouldn't be relevant to you?
16    **A. Well, it's relevant, but he had just walked**
17 **over from the site of the altercation to the**
18 **infirmary.**
19    Q. How do you know he walked over?
20    **A. It's in the records.**
21    Q. Where does it say he was walked over in the
22 records -- that he walked over in the records?
23    **A. Well, I don't remember, but I -- I quite**
24 **clearly remember that either a prison guard or**
25 **provider said that he had -- he had walked 150 feet or**

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.                                         Stephen C. Saris, M.D.
No. 1:21-CV-01027-JB-GBW                                                              October 10, 2023

Page 50

1  so from the site of the altercation to the infirmary.
2      Q. Do you know if he was -- he walked or if he
3  was carried?
4      A. It said he walked.
5      Q. You -- you -- according to your memory, is
6  that -- there was testimony that he walked?
7      A. Yes.
8      Q. Did you -- do you remember that there was
9  testimony that he was restrained?
10     A. It -- he was restrained?  I don't think at
11 this point, he was restrained.  He was just more
12 accompanied, is my recollection.
13     Q. Okay.  So you don't remember that he had his
14 arms handcuffed behind his back?
15     A. I don't recall one way or the other.
16     Q. Did you review the picture of him in the --
17 in the -- at 8:00 p.m.?
18     A. I'm not sure what time, but there's a picture
19 of him in an orange -- orange clothing of some sort,
20 and he is bloodied in a few spots.
21     Q. Okay.  Wait a second.  I'm going to go back
22 to the other medical record for -- the other version
23 of the medical record before we move on.  All right.
24 Can you see this other version now?
25     A. I can.

Page 51

1      Q. Okay.  And you see, again, this is November
2  10, 2018?
3      A. Yes.
4      Q. You can see that, again, it's at 2000 hours,
5  or 8:00 p.m.?
6      A. Yes.
7      Q. Okay.  And you can note in this version of
8  the record it has that -- "inmate blindsided" --
9      A. Yes.
10     Q. -- correct?  All right.  And then it has,
11 "inmate bloody"?
12     A. Yes.
13     Q. And then this one says, "Inmate denied pain,
14 then stated minimal pain"?
15     A. Yes.
16     Q. And then it says, "Cleaned -- Cleaned inmate
17 and prepared chart for seg transfer."  Do you see
18 that?
19     A. Yeah, I'm not sure what the seg means, but I
20 can see what you're referring to.
21     Q. All right.  Well, I'll just represent to you
22 that seg means segregation.
23     A. Okay.
24     Q. Did you know that Tyler Wheeler was being
25 sent to segregation?

Page 52

1      A. Yes.  My recollection from the records is the
2  other inmate was being brought in, and they decided to
3  separate the two.
4      Q. I know.  But did you know that Tyler Wheeler
5  was ultimately going to segregation?
6      A. Once again, please.
7      Q. Did you know he was ultimately going to be
8  sent over to segregation?
9      A. Yes.
10         MR. ORTIZ:  Objection, form, foundation.
11     A. Yes.
12     Q. Now, in this version of the record, there is
13 nothing about Tyler Wheeler commenting about fighting
14 or childish behaviors, is there?
15     A. Agreed.
16     Q. And in this record, there's no documentation
17 regarding a PERRLA?
18     A. Agreed.
19     Q. If this is determined to be the record that
20 is the accurate record, is this sufficient for
21 determining whether Tyler Wheeler has any kind of
22 neurological deficits?
23     A. It -- it documents that his level of
24 consciousness is alert, which is good, but it doesn't
25 document anything else.

Page 53

1      Q. And where does it say Tyler Wheeler is alert?
2      A. Well, he was asked -- he denied that he had
3  blacked out.  He said, "I'm bloody."  That indicates
4  that he's alert.  And level of consciousness is the
5  most important thing to surveil.
6      Q. With level of consciousness, you can have
7  varying degrees of level of consciousness, correct?
8      A. Yeah, there are four of them.
9      Q. And then there's a level of consciousness
10 where you can respond, but maybe you're not all there?
11     A. No.  At this level, you're alert.
12     Q. Okay.  So there's only alert or comatose?
13     A. No, no, there are four:  alert, lethargic
14 stuporous, and comatose.
15     Q. And you think based on just this information,
16 he's alert?
17     A. Pardon me?
18     Q. You think just on this information he's
19 alert?
20     A. Yes.
21     Q. What other information could be used to
22 assess whether he's alert, lethargic, stuporous, or in
23 a coma?
24     A. No, this is all you need.
25     Q. You don't need to do anything else in the

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 54

1  exam?
2  **A. No.**
3  Q. You don't need to do a Glasgow Coma Scale?
4  **A. No.**
5  Q. You don't need to do any kind of motor
6  assessment?
7  **A. No. Just the fact that you're talking to**
8  **him, he's claiming this, he's denying that, that's all**
9  **you need. He's alert.**
10  Q. So you don't need to do a PERRLA in the
11  context of a head trauma?
12  **A. No. You can do it. You can not do it. It's**
13  **optional. The most important thing is the level of**
14  **consciousness.**
15  Q. All right. It's not important that Tyler
16  Wheeler -- should there have been a physical exam of
17  his head?
18  **A. Once again, please.**
19  Q. Should there have been a physical exam of his
20  head?
21  **A. You can do it. You can not do it. I mean,**
22  **you know he was in a fight. You know he's bleeding.**
23  **That's all you need.**
24  Q. So you shouldn't examine his head for -- to
25  see if there's any depressed -- depressions in his

---

Page 55

1  head? You don't think that's necessary?
2  **A. Yeah, same answer. You can do it. You can**
3  **not do it. Both are fine.**
4  Q. So as long as they -- they're talking to you,
5  you don't need to do any other assessment?
6  **A. Right. Yeah, the guy can walk. He can talk.**
7  **He tells you about the altercation. That's all I**
8  **need.**
9  Q. Okay. I'm going to go ahead and show you
10  what -- I think we're on Exhibit 7.
11  (Exhibit 7 marked for identification.)
12  THE REPORTER: Yes.
13  Q. Why is this not showing? Click to share.
14  All right. Can you see the photo?
15  **A. Yes, this is the one I was referring to**
16  **earlier.**
17  Q. Can you see the time up here says 8:00 p.m.
18  on the top left corner?
19  **A. Yes.**
20  Q. And it was -- the date is incorrect. It has
21  it as November 11, 2018, but the testimony is that it
22  was November 10, 2018.
23  All right. So you can -- you've reviewed
24  this picture of Tyler Wheeler?
25  **A. Yes.**

---

Page 56

1  Q. And you can see that he's got swelling on the
2  top of his forehead?
3  **A. Yes.**
4  Q. And it's your testimony that you don't need
5  to touch or feel around his forehead to see if there's
6  any depression there, even though he's got swelling on
7  his forehead?
8  **A. No. When I go to the emergency room, I**
9  **don't. I just -- level of consciousness is the main**
10  **thing.**
11  Q. Do you expect your nurses to feel his skull
12  and make sure he's okay?
13  **A. You can do it. You can not do it. Both are**
14  **fine.**
15  Q. You shouldn't examine -- you don't need to
16  examine for any kind of lacerations in the skull or
17  anything like that?
18  **A. Well, if there's active bleeding, you need to**
19  **check to see if there's a laceration that needs to be**
20  **sutured.**
21  Q. All right. So I just want to know -- kind of
22  review the symptoms we know from Tyler Wheeler at
23  8:00 p.m. We know that he was hit in the head, and we
24  know there was a trauma to his head, correct?
25  **A. Yes.**

---

Page 57

1  Q. And we know that he was -- reported that it
2  was continuous?
3  **A. Agreed.**
4  Q. Okay. And we know he had blood from his
5  nose, correct?
6  **A. Yes.**
7  Q. And we know he had blood from his ear?
8  **A. Yes.**
9  Q. And we know he had a bump to the left upper
10  forehead, correct?
11  **A. Yes.**
12  Q. He -- in one of the records, it's documented
13  that he had minimal pain?
14  **A. Yes.**
15  Q. All right. And neither record has a Glasgow
16  Coma Scale, correct?
17  **A. Agreed.**
18  Q. And neither record documents orientation to
19  person, place, or time, correct?
20  **A. Agreed.**
21  Q. And neither record assesses his motor skills?
22  **A. Agreed.**
23  Q. And only one record documents a PERRLA?
24  **A. Yes, that's correct.**
25  Q. All right. Now --

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 58

1  MR. WALKER: You know what? We need to
2  take a five-minute break. There is someone in the
3  office next to me who is doing some work, and I need
4  to tell them to stop, so I'll be right back.
5  MR. PARK: Okay. No problem.
6  THE WITNESS: I'm just going to -- why
7  don't everybody just stay on, and we'll just wait for
8  you?
9  THE VIDEOGRAPHER: Off the record at
10  12:15 p.m.
11  (Recess taken from 12:15 p.m. to 12:16 p.m.)
12  THE VIDEOGRAPHER: On the record at
13  12:16 p.m.
14  Q. (By Mr. Walker) All right. Dr. Saris, now,
15  in your report, you document -- you list in that --
16  you listed that you reviewed the deposition testimony
17  of Gabriel Guzman. Do you remember that?
18  A. Yes.
19  Q. Okay. And you understand that Gabriel Guzman
20  observed Tyler Wheeler while he was in the library?
21  A. Yes.
22  Q. I'm going to go ahead and pull up some
23  deposition testimony from Gabriel Guzman. We'll mark
24  this as Exhibit 8.
25  (Exhibit 8 marked for identification.)

---

Page 59

1  Q. All right. Tell me when you can see my
2  screen.
3  A. Yeah, not quite yet.
4  Q. Can you see it now?
5  A. Got it.
6  Q. I'm going to scroll down. All right. So the
7  first thing I just want to talk about is just to set
8  up the time frame here, because your opinion is that
9  Tyler Wheeler's neurologically normal between
10  8:00 p.m. and 9:10 p.m. You can see I highlighted
11  some testimony here. Can you see that?
12  A. Yes.
13  Q. And in this testimony, I asked Officer
14  Guzman, "I have that you went to the library around
15  8:05 p.m. Does that sound right to you?"
16  And he answered, "8:05 sounds right, yes."
17  A. Okay.
18  Q. Do you see that? Okay. So we're talking
19  about -- now about 8:05 p.m.?
20  A. Yes.
21  Q. All right. Now, I want to scroll down in
22  this deposition. Now, the first thing I want to talk
23  about is that Doc- -- Guzman, in the library, sees
24  swelling on Tyler Wheeler's forehead. Okay?
25  A. Yes.

---

Page 60

1  Q. So I asked him -- this is on 22, starting on
2  line 3 -- I said, "You walk in the library.
3  Mr. Wheeler is in front of you facing you. Is there
4  anybody who comes in the library with you?"
5  His answer was, "No."
6  And I ask, "So it's just you and
7  Mr. Wheeler?"
8  The answer is, "Correct."
9  And I say, "And this is 8:05 p.m.?"
10  "Approximately, yes."
11  And then I ask, "And he doesn't have blood on
12  his face, but he has swelling on his forehead that you
13  can see?"
14  And his answer is, "Yes."
15  Q. Do you see that testimony?
16  A. Yes.
17  Q. So we have testimony that Tyler Wheeler has
18  swelling on his forehead around 8:05 p.m.?
19  A. Yes.
20  Q. Now, shortly thereafter, we have testimony
21  that Tyler Wheeler starts to complain of pressure and
22  hurting in his head within a few minutes. Do you
23  remember that testimony?
24  A. Yes.
25  Q. Okay. So -- and I'll just kind of go over

---

Page 61

1  this so it's on the record here. In one -- he was
2  answering -- I asked him, "What did he tell you?"
3  And he answered -- it talks about working in
4  the unit, and then it goes to, "Of course, you know,
5  with this having been the fight, I just asked him how
6  he was doing. He mentioned having some pressure in
7  his head."
8  And I asked, "Can you explain that a little
9  bit more? What do you mean" -- "he had pressure in
10  his head?"
11  ANSWER: "He just -- he stated to me,
12  "Mr. Guzman, I feel a lot of pressure in my head.
13  Could you call the nurse again?"
14  And I asked, "How long were you in the room
15  before he complained about pressure in his head?"
16  ANSWER: "He complained within minutes" -- or
17  "He complained within the first couple of minutes when
18  I got there that -- that his -- that the pressure was
19  bothering him. I advised Mr. Wheeler that he had
20  already been seen by the medical staff prior to us
21  going into the library and that I would notify them
22  again that he was requesting their presence because of
23  the pressure and the pain in his head."
24  And I asked, "And he characterized it as
25  pressure and pain?"

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 62

1    And Officer Guzman testified, "He just said
2 he was having -- feeling a lot of pressure and -- and
3 it was hurting."
4    Do you see that testimony?
5    **A. Yes.**
6    Q. So we can agree, then, within a few minutes
7 of being in the library, Tyler Wheeler has pressure --
8 a lot of pressure and pain in his head, correct?
9    **A. Agreed.**
10    Q. Then Tyler Wheeler starts to complain of
11 nausea. And let's go to page -- this is -- I'm going
12 to -- it's page 25 of the deposition. Do you remember
13 that he complained of nausea?
14    **A. Yes.**
15    Q. So I asked, "What happens after this? That
16 he -- after he complains about the pressure in the
17 head, asks you for medical, what's next?"
18    "He -- he states to me that he's starting to
19 feel nauseous."
20    And I asked, "How long were you in the room
21 when he starts to complain about nausea -- nauseous or
22 nausea?"
23    ANSWER: "Not long after he mentioned the --
24 having the pain and the pressure in his head. He --
25 he stated that he started to feel nauseous. And I --

Page 63

1 I looked for a small trash can." And he talks about
2 how there's usually small trash cans.
3    I asked, "Would you say you were in there 10
4 or [sic] 15 minutes?"
5    ANSWER: "Fifteen minutes would be."
6    QUESTION: "So if you get into the library
7 around 8:05, we're talking that he's complaining about
8 pressure and nausea around 8:20, in-between that time
9 frame?"
10    "Yes."
11    And I asked, just to confirm, "So between
12 8:05 and 8:20, Mr. Wheeler has complained about
13 pressure and pain in his head and nausea?"
14    "Correct."
15    Do you see that testimony?
16    **A. Yes.**
17    Q. Okay. So between 8:05 and 8:20, he's got
18 nausea, pressure in his head, and pain, correct?
19    **A. Yes.**
20    Q. All right. And then I want to scroll down.
21 Do you remember Officer Guzman observing blood in
22 Tyler Wheeler's ear?
23    **A. Oh, if you could ask me that again, I'd**
24 **appreciate it.**
25    Q. Okay. Do you remember Officer Guzman

Page 64

1 testifying that he saw blood inside Tyler Wheeler's
2 ear?
3    **A. No.**
4    Q. So let's take a look here at page 28, line
5 24. I asked, "Did you notice any swelling, redness,
6 or anything else on the left side of his face?"
7    ANSWER: "He still had some blood in and
8 around his ear, yes."
9    And then I followed up, "And you said
10 that" -- that -- "you said there was blood in and
11 around his ear, correct?"
12    "Correct."
13    Okay. So we can agree now that Tyler Wheeler
14 has blood in his ear while he's in the library,
15 correct?
16    **A. Yes.**
17    Q. All right. Do you remember the testimony
18 that his nose started to rebleed?
19    **A. No.**
20    Q. Okay.
21    **A. It says it right there on line 22.**
22    Q. Yeah, and so we'll just -- I want to go
23 through and make sure the record is clear on this. So
24 on page 29, line 20, it starts. I asked, "So he had
25 swelling on his forehead. There was the blood in his

Page 65

1 ear. At some point his -- he starts -- his nose
2 starts bleeding again; is that right?"
3    ANSWER: "Yes."
4    Okay. So we know his nose starts to rebleed
5 again, correct?
6    **A. Yes.**
7    Q. Now, do you remember Officer Guzman's
8 testimony that Tyler Wheeler's -- started to --
9 alertness started to change, and he started to appear
10 hazy?
11    **A. No.**
12    Q. Let's scroll down. This is on line 30- --
13 page 36. Okay. And this starts at line 7. I ask,
14 "When you were talking to State Police, you reported
15 that Mr. Wheeler started to seem kind of hazy to you
16 while you were in the library; does that sound right?"
17    ANSWER: "It does."
18    "Okay. Was this before or after medical came
19 to the library?"
20    "This was before medical came to the
21 library."
22    And then we talked about it a little bit more
23 down below here, on page 37. And, "And" --
24 this starts at line 5 -- "so you watched him from when
25 he arrived at 8:05 until you guys leave the library,

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 66

1  right?"
2         He answers, "Yes."
3         I asked, "Based on your observation,
4  Mr. Wheeler's alertness changed from when you entered
5  the library and when you left, right?"
6         He answered, "Yes."
7         And, "He became more hazy over that period of
8  time, right?"
9         ANSWER: "Yes, I believe so."
10        Do you see that testimony?
11  **A. I do.**
12     Q. Okay. So based on this testimony,
13  Mr. Wheeler's alertness is changing, and he's becoming
14  more hazy, correct?
15  **A. Correct. He continues to be alert. I'm not**
16  **entirely sure what the officer meant by "hazy," but it**
17  **seemed like the quality or the character of his**
18  **alertness had changed.**
19     Q. Okay. All right. Did you know that Tyler
20  Wheeler started slumping in the chair?
21  **A. No.**
22     Q. Let's go down to page 49, and this starts at
23  line 19. And I asked him, "Yesterday, Lieutenant
24  Udero testified that he got a call from a correctional
25  officer in the library that Mr. Wheeler had -- fell or

Page 67

1  slipped or gone onto the floor of the library. Does
2  this sound familiar to you?"
3         ANSWER: "It does -- it" -- I'm sorry --
4  "It -- it does. As I was there in the library with
5  him, he would begin to talk [sic]" -- or "he would
6  begin to like slump -- slump down from the chair he
7  was sitting in."
8         QUESTION: "Okay. And he was slumping down
9  and what? He slumped until he slid onto the floor?"
10        ANSWER: "He would just -- slumping down
11  as he was in his [sic]" -- "as he was -- his posture
12  in the chair, he wasn't sitting straight up. He was
13  slumping down. And I would assist him into
14  repositioning himself in the chair.
15        "And he was just complaining of the pressure.
16  And he said he felt that he wanted to be [sic] -- get
17  more comfortable."
18        QUESTION: "Was he having difficulty holding
19  himself up straight?"
20        ANSWER: "He appeared to be having
21  difficulty, yes."
22        QUESTION: "Was this before or after medical
23  did their evaluation in the library?"
24        ANSWER: "This was before."
25        QUESTION: "Did medical know or was it

Page 68

1  communicated to medical that Mr. Wheeler was
2  struggling to hold himself up?"
3         ANSWER: "From what they -- from -- from
4  what -- from what I could when the nurse was there,
5  she could visually see Mr. Wheeler having these
6  difficult -- difficulties sitting in the chair. As
7  she was assessing him, he was -- you know, he was
8  slumping down and his head was tilted, and...."
9         QUESTION: "Did Mr. Wheeler end up on the
10  floor?"
11        "He did."
12        Did you see all that?
13  **A. Yes.**
14     Q. So based on that testimony, we know that
15  Tyler Wheeler was slumping in the chair and having
16  difficulty holding himself up --
17  **A. Yes.**
18     Q. -- correct?
19  **A. Correct.**
20     Q. We know his head was tilted, correct?
21  **A. Yes.**
22     Q. And we know he falls onto the floor, correct?
23  **A. Yes.**
24     Q. And then this all happens before medical
25  arrives, correct?

Page 69

1  **A. Yes.**
2     Q. Now, I want to talk about when medical
3  arrives. Do you know who from medical comes to see
4  Tyler Wheeler?
5  **A. I don't recall.**
6     Q. Okay. So I'm going to go to where Guzman
7  talks about that. This is on page 33. And I asked on
8  line 3, "When medical comes into the library, who
9  comes -- who from medical comes?"
10        ANSWER: I believe her name was Angelica.
11  They call her Angelica {pronouncing}. I don't know
12  her -- her last name or -- or not. But she -- she was
13  the one that walked in."
14        QUESTION: "Okay. It wasn't Nurse Hudson?"
15        ANSWER: "Not that I remember."
16        Do you see that testimony that says that
17  Angelica Benavidez is the one who comes to the
18  library?
19  **A. Yes.**
20     Q. Did you ever review Angelica Benavidez's
21  deposition testimony?
22  **A. Let's have a look. If you could give me the**
23  **date of her testimony, because a lot of what I have in**
24  **my report is in chronological order.**
25     Q. Well, I can tell you this: Her deposition is

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.

Stephen C. Saris, M.D.

No. 1:21-CV-01027-JB-GBW

October 10, 2023

---

Page 70

1 not listed in your report.
2 **A. Yeah, and I'm looking at my report, and I**
3 **don't see it. So my answer is not that I recall.**
4 Q. Okay. So then let's go ahead and look at
5 Angelica Benavidez's testimony.
6 **A. Sure.**
7 Q. And we'll mark this as Exhibit 9. Do you
8 know who Angelica Benavidez is in terms of this case?
9 (Exhibit 9 marked for identification.)
10 **A. No.**
11 Q. Did you know that she was a records
12 custodian?
13 **A. No.**
14 Q. I'll go ahead and share this with you. All
15 right. I'm going to scroll down a little bit
16 here. All right. So just to give you some context
17 before I read this, Angelica Benavidez was a records
18 custodian who -- and she is the daughter of Natalia
19 Hudson, and she was sent by Natalia Hudson, the nurse,
20 to go look at Tyler Wheeler. Okay?
21 **A. Sure.**
22 Q. Now, you see her testimony here?
23 **A. Yes.**
24 Q. And this starts at page 54, and it says --
25 she was asked, "All right. So let's go to that

---

Page 71

1 incident, so November 10, 2018. What do you remember
2 on that date?"
3 She answers, "Well, I -- my mother, she was
4 doing med pass, and she had just finished doing med
5 pass, so she was cleaning everything up. We were
6 basically -- we were getting ready to leave, and we
7 heard we -- heard officers running down the hallway,
8 so we figured something was going on.
9 "Soon after, we heard a knock on the door,
10 and we opened the door. The officers brought in
11 Wheeler. He was the first one that she assessed. I
12 remember he was yelling and I guess talking about the
13 situation, and he was yelling, cussing. And then my
14 mom started assessing him. And then they took him out
15 and brought in the other guy. She assessed him. And
16 then one of the officers knocked on the door and said
17 that Wheeler didn't look too good.
18 "I just remember -- I remember seeing him
19 sitting on the floor next to the wheelchair and
20 telling my mom, 'This guy doesn't look good, like he
21 wasn't yelling like he was earlier. And he's sitting
22 on the floor, and the officer is having a hard time
23 getting him up.'
24 "And then I just remember my mom" -- "calling
25 Dr. Andrade for orders, and she told me to go check

---

Page 72

1 his blood sugar."
2 Okay. So from this testimony, we have that
3 she sees Tyler Wheeler sitting on a floor, correct?
4 **A. Yes.**
5 Q. She believes he does not look good, correct?
6 **A. Yes.**
7 Q. That his status has changed since he was
8 there at 8:00 p.m., correct?
9 **A. Yes.**
10 Q. And he's sitting next to a wheelchair,
11 correct?
12 **A. Agreed.**
13 Q. Do you know why there's a wheelchair there?
14 **A. I presume to help him get from one place to**
15 **another.**
16 Q. And then this all occurs before any calls to
17 Dr. Andrade, correct?
18 **A. I don't recall, but I'll take your word for**
19 **it.**
20 Q. Okay. Well, she says --
21 MR. PARK: Object to form.
22 Q. She says, "I remember seeing him sitting on
23 the floor next to the wheelchair and telling my mom,
24 'This guy doesn't look good'" -- "'he wasn't yelling
25 like he was earlier. He's sitting on the floor, and

---

Page 73

1 the officer is having a hard time getting him up.'
2 "And then I just remember my mom" -- "calling
3 Dr. Andrade for orders."
4 So based on this testimony, the sequence of
5 events is she sees him on the floor, and then her mom
6 is calling Dr. Andrade for orders, correct?
7 **A. Yes.**
8 Q. And I'm going to share with you
9 Dr. Andrade's order -- the order. And I believe this
10 will be Exhibit 10.
11 (Exhibit 10 marked for identification.)
12 Q. All right. I'll share my screen here. Let
13 me know when you can see it.
14 **A. Yeah, it's pretty blank, except for one**
15 **notation.**
16 Q. Yeah, yeah, and I'm going to go the one we're
17 talking about here. All right. Can you see this
18 order at the top?
19 **A. Agreed.**
20 Q. All right. And you can see that it says,
21 "T-O" -- "To Dr. Andrade"?
22 **A. Yes.**
23 Q. And this -- and the date and time is November
24 10th at 8:40 p.m.?
25 **A. Agreed.**

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.

Stephen C. Saris, M.D.

No. 1:21-CV-01027-JB-GBW

October 10, 2023

Page 74

1    Q. Okay. So if you -- you know, if we take into
2  consideration the date and time of this order and
3  Angelica Benavidez's testimony, she is seeing Tyler
4  Wheeler sitting on the floor, not looking good,
5  sitting next to a wheelchair before 8:40 p.m.,
6  correct?
7    **A. Agreed.**
8    Q. I'll stop sharing that.
9      Now, I want to talk about this wheelchair a
10  little more, and I'll go back. Do you know why he
11  needed the wheelchair to get around?
12    **A. No.**
13    Q. Okay. I'm going to first talk -- we'll look
14  at -- this is Nurse -- or not Nurse -- Angelica
15  Benavidez's testimony starting on page 80. And she
16  was asked, "You testified that you went -- when you
17  went" -- "observed Tyler Wheeler the second time, and
18  that's when you were drawing that blood sugar test,
19  you said that Tyler Wheeler was sitting in a
20  wheelchair; is that right? Or I believe you said
21  sitting next to a wheelchair?"
22      ANSWER: "I think he was sitting next to the
23  wheelchair. He wasn't -- I don't think he was sitting
24  on the wheelchair."
25      QUESTION: "Do you know how the wheelchair

Page 75

1  got there?"
2      ANSWER: "I don't remember if I took it, or
3  if we gave it to the officer and the officer took it.
4  I don't remember."
5      QUESTION: "If you had been the one to take
6  the wheelchair, why would you have provided Tyler
7  Wheeler the wheelchair?"
8      ANSWER: "Because somebody asked for it or
9  because somebody told me to take it."
10      QUESTION: "Had you ever provided an inmate"
11  -- "any inmate a wheelchair before November 10, 2018?"
12      ANSWER: "Not that I remember."
13      QUESTION: "Do you know why Tyler Wheeler
14  would have needed a wheelchair on November 10, 2018?"
15      ANSWER: "Because he could not stand up."
16      And then the question, "Do you know why Tyler
17  Wheeler could not stand up on November 10, 2018?"
18      ANSWER: -- I didn't highlight this part --
19  "Because he was having a change of mental status."
20      Do you see that testimony?
21    **A. I do.**
22    Q. Okay. So we know that while he's in the
23  library, he needs the wheelchair, correct?
24    **A. Agreed.**
25    Q. And he needs a wheelchair because he can't

Page 76

1  stand up, correct?
2    **A. That's a little strong. Certainly, it seems
3  like the folks in the room were concerned about his
4  balance and whether he could stand by himself.**
5      MR. ORTIZ: Objection, form.
6    Q. So the person who observed him on November
7  10, 2018, believed he could not stand up?
8    **A. Yes.**
9    Q. And she believed he had a changed mental
10  status, correct?
11    **A. Yes.**
12    Q. Now, that is Angelica Benavidez's testimony.
13  I also want to look at Officer Guzman, another witness
14  who saw Tyler Wheeler in the library and what he has
15  to say about the wheelchair.
16    **A. Sure.**
17    Q. Go back here. Let me know when it's sharing.
18  Do you see it?
19    **A. I do.**
20    Q. All right. I'm going to scroll down from
21  line [sic] 48 when I start asking about it. So I ask:
22      QUESTION: "Who brought the wheelchair over?"
23      ANSWER: "The nurse."
24      QUESTION: "So the nurse knew that he wanted
25  a wheelchair to help get Mr. Wheeler to the van?"

Page 77

1      ANSWER: "Yes. The -- the -- the wheelchairs
2  are in the infirmary, in the medical unit" -- "And
3  from what I remember, it was placed out because the
4  library is straight across from -- from the infirmary,
5  from medical.
6      "And the wheelchair was placed right out
7  there in the hallway, and I grabbed it from there."
8      QUESTION: "Was the wheelchair placed out in
9  the hallway for Mr. Wheeler?"
10      ANSWER: "Yes, it was for Mr. Wheeler.
11  Correct."
12      QUESTION: "So medical knew that Mr. Wheeler
13  needed a wheelchair?"
14      ANSWER: "Yes."
15      "Do you remember which nurse put the
16  wheelchair out in the hallway?"
17      ANSWER: "I don't remember, no."
18      QUESTION: "Did you make a request for a
19  wheelchair on the radio?"
20      ANSWER: "I just remember telling them that
21  he" -- "that he felt that he couldn't -- couldn't
22  physically walk on his own; therefore, we got him the
23  wheelchair."
24      QUESTION: "You communicated to medical that
25  Mr. Wheeler felt he couldn't walk on his own?"

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 78

1    ANSWER:  "I advised that we needed a
2  wheelchair for him, yes, to escort him out."
3    And -- QUESTION:  "Just to add clarity:  You
4  advised medical that he" -- "you needed a wheelchair
5  to escort him out?"
6    ANSWER:  "Correct."
7    QUESTION:  "Because Mr. Wheeler communicated
8  he did not feel he could walk out?"
9    "Yes."
10    So another witness to that night is saying
11  that Wheeler could not walk; isn't that right?
12  **A. Yes.**
13    Q. And this is in the library?
14  **A. Agreed.**
15    Q. All right.  So I want to summarize, then,
16  what we've now just talked about, about -- because
17  Tyler Wheeler -- because the wheelchair is in there
18  before -- around 8:40, because that's when she's going
19  to do the blood sugar -- or, I'm sorry, 8:50.  So this
20  is from 8:05 to 8:50 what we know about Tyler Wheeler.
21  Okay?
22  **A. Agreed.**
23    Q. We know that he has a lot of pressure in his
24  head between 8:05 and 8:50, correct?
25  **A. Agreed.**

Page 79

1    Q. He's complaining of pain in his head between
2  8:05 and 8:50?
3  **A. Agreed.**
4    Q. He's complaining of nausea between 8:05 and
5  8:50, correct?
6  **A. Agreed.**
7    Q. His nose starts to rebleed?
8  **A. Agreed.**
9    Q. And, I'm sorry, his nose starts -- starts to
10  rebleed between 8:05 and 8:50, correct?
11  **A. Sure.**
12    Q. And Officer Guzman observes blood in his ear
13  between 8:05 and 8:50?
14  **A. Agreed.**
15    Q. And Officer Guzman is noting that Tyler
16  Wheeler is becoming hazier between 8:05 and 8:50?
17  **A. Agreed.**
18    Q. And this is commiserate with a change in his
19  alertness, correct?
20  **A. Still alert, but not as alert, agreed.**
21    Q. We -- Tyler Wheeler starts slumping in his
22  chair between 8:05 and 8:50 p.m.?
23  **A. Agreed.**
24    Q. And this was because he was having difficulty
25  sitting up, correct?

Page 80

1  **A. Yes.**
2    MR. ORTIZ:  Objection, form.
3    Q. And Tyler Wheeler -- witnesses noted that his
4  head was tilting between 8:05 and 8:50 p.m., correct?
5  **A. Agreed.**
6    Q. And Tyler Wheeler was falling to the floor
7  between 8:05 and 8:50?
8    MR. ORTIZ:  Objection, form.
9    Q. I'm sorry, can you say that answer again?
10  **A. Yes.**
11    Q. So between 8:05 and 8:50, Tyler Wheeler fell
12  to the floor?
13    MR. ORTIZ:  Objection, form.
14  **A. No, that I don't recall specifically --**
15    MR. PARK:  Join.
16  **A. -- but he -- he certainly needed -- the**
17  **people in the room felt he needed a wheelchair to get**
18  **safely from place A to place B.**
19    Q. Okay.  Let's just -- well, and then we'll go
20  back to that.  Between 8:05 and 8:50, Angelica
21  Benavidez is noting that Tyler Wheeler looks worse,
22  correct?
23  **A. Yes.**
24    Q. And then between 8:05 and 8:50, he -- two
25  witnesses believe he needs a wheelchair because he

Page 81

1  can't walk?
2  **A. Yes.**
3    Q. And then, regarding the falling on the floor,
4  let's go back to Guzman's testimony here just so we
5  have it on the factual record.
6    I'm sorry.  I guess he slid onto the floor
7  from his chair?
8  **A. Agreed.**
9    Q. Okay.  So that -- he slid -- he slides onto
10  the floor between 8:05 and 8:50 p.m., correct?
11    MR. ORTIZ:  Objection, form.
12  **A. Agreed.  It's -- it's right there in the**
13  **depo.**
14    Q. Knowing these facts, is it still your opinion
15  and testimony that Tyler Wheeler was alert and
16  interactive between 8:00 and 9:10 p.m.?
17  **A. Yes.**
18    Q. So even though he was unable to stand on his
19  own, needed a wheelchair to move, was slumping in a
20  chair, head tilting, sliding to the floor, not looking
21  good, appearing hazy over time, blood in his ear,
22  rebleeding nose, nausea, pain in the head, and a lot
23  of pressure in his head, your testimony is that he is
24  awake and interactive?
25    MR. ORTIZ:  Objection, form.

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 82

1    A. It is. It's a medical definition. He
2 continues to be alert. We -- we can agree he's not as
3 alert, but he has not become what doctors call
4 lethargic. And as such, the only thing I would have
5 done is what Dr. Andrade did, which is increase his
6 surveillance.
7    Q. So knowing these facts, it's still your
8 testimony that Tyler Wheeler did not go -- need to go
9 to the hospital?
10    A. Correct. He just needed increased
11 surveillance, because he continued to be alert.
12    Q. If a patient presented to you with these same
13 symptoms in the outpatient facility in the context of
14 a head trauma, is it your testimony you would not send
15 them to a hospital?
16    A. I would send anybody in that kind of fight,
17 regardless of this, that, and the other to the ER.
18    Q. Okay. So what's the difference, then,
19 between sending them to an ER here, like you just
20 said, versus what Dr. Andrade did, which is order
21 observation?
22        MR. PARK: He's in a correction- --
23    A. Well, because at the time, Mr. Wheeler was in
24 an infirmary with a trained healthcare provider or
25 nurse to -- to look over him. If I'm in my office,

---

Page 83

1 it's just me and a secretary.
2    Q. Okay. Is there any other reason why you
3 would send -- well, I mean, it's just a nurse in the
4 correctional facility.
5    A. Agreed.
6    Q. So how is that different than you being in
7 your own facility?
8    A. It's very different. I mean, I'm -- I'm --
9 I'm in a doctor's office. All I've got is a bunch of
10 paperwork and computers. You know, he's in an
11 infirmary, which is set up to, you know, treat
12 patients, has a nurse -- I'm sure has seen many
13 altercations. Perfectly appropriate to just keep the
14 person there, but just increase the level of
15 surveillance.
16    Q. Okay. What is available in the infirmary at
17 Southern New Mexico Correctional Facility that's not
18 available in your office?
19    A. A nurse.
20    Q. Okay. But you're a doctor.
21    A. Agreed.
22    Q. You're a higher level of care, aren't you?
23    A. Right. But I'm -- I'm -- I'm doing other
24 stuff. I'm seeing other patients, doing -- taking
25 calls from the ER, stuff like that. That is that

---

Page 84

1 nurse's assignment, to look after him.
2    Q. And she has other -- you understand she has
3 other inmates in the facility, correct?
4    A. Agreed.
5    Q. She has other people she needs to be looking
6 after, too?
7    A. At the time, I don't know as there was
8 anyone -- other than the other inmate, and if that
9 other inmate had even left at that time. But,
10 basically, her main assignment was to surveil
11 Mr. Wheeler.
12    Q. Should she have kept him in the medical unit
13 then?
14    A. Yeah, it was -- it was perfectly reasonable
15 to keep him there and just -- just observe him more
16 frequently than she had been observing him before.
17 That's what Dr. Andrade ordered, and that's what I
18 would have ordered if I was covering that place.
19    Q. Okay. So your testimony is if someone showed
20 up to your practice group, you would send them to the
21 ER immediately, but for Nurse Hudson, she's allowed to
22 observe him?
23    A. Correct. If anybody comes to my office after
24 an altercation like that, 100 percent of them, I send
25 them to the ER.

---

Page 85

1    Q. If this was your family member with these
2 same symptoms, is it your testimony that you would not
3 send them to the hospital?
4    A. Yes.
5    Q. All right. Let's talk about your opinions 3
6 and 4. Well, you have your report in front of you,
7 correct?
8    A. No.
9    Q. You don't. Okay. We'll pull it up for you
10 then. All right. So we have an opinion here. Can
11 you see your report?
12        MR. PARK: No.
13    A. No. It's -- I've got a task bar, but nothing
14 else.
15    Q. Let me try again. Now is it up?
16    A. Yes.
17    Q. All right. Now, it says, "Mr. Wheeler was
18 comatose at approximately 9:40 p.m. on November 10,
19 2018. By that time, he was past the point of return
20 to normal neurological function"; is that right?
21    A. Yes.
22    Q. That's one opinion. And then you have -- I
23 kind of see this as related, but maybe they're --
24 they're sufficiently different. You have, "If
25 Dr. Andrade had ordered emergency transfer at

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 86

1  8:40 p.m., Mr. Wheeler's outcome would have been the
2  same."
3      **A. Yes.**
4      Q. Okay. So is it your testimony, then, that no
5  matter when Tyler Wheeler was sent to the hospital,
6  his neurological damage would have been exactly the
7  same?
8      **A. Yes. There are certain red lines in medicine**
9  **beyond which the outcome is predictable. And**
10  **Mr. Wheeler was to be -- he -- he was -- his outcome**
11  **would be vegetative or dead between 9:00 and 10:00.**
12  **So he went past -- he went past that red line between**
13  **9:00 and 10:00 where the only outcome was that he**
14  **would be vegetative or dead.**
15      Q. And there is no degree of variation between
16  how much neurological dysfunction he'd suffer based on
17  the timing and when he would've gotten surgery?
18      **A. No. Vegetative or dead.**
19      Q. And you -- what time is that red line for
20  you?
21      **A. Between 9:00 and 10:00.**
22      Q. Okay. Can you be a little more specific?
23  Why 9:00 to 10:00?
24      **A. Because that's when he became -- that's when**
25  **his level of consciousness did change from alert to**

Page 87

1  **non alert, and that's when he had that -- what we call**
2  **a blown pupil, that large and unmoving pupil. When --**
3  **when you pass that red line, you're going to be**
4  **vegetative or dead.**
5      Q. So let me ask you this, because it sounds
6  like once you cross that line, it's -- according to
7  you, it's -- you're -- you're going to have suffered
8  extreme neurological dysfunction, right?
9      **A. Beyond the point of no return; that's**
10  **correct.**
11      Q. So then why wouldn't you send someone to the
12  ER if they're raising a bunch of red flags of brain
13  injury before you cross the point of no return?
14      **A. For me, they're not red flags. They're just**
15  **indications that I need to keep a closer eye on him.**
16      Q. Right. But what you're telling me is once
17  the one sign to send him to the hospital occurs, this
18  blown pupil, you've already crossed the -- line.
19  So why wouldn't -- why would you wait for the one sign
20  that he's already suffering the damage?
21      **A. Right. Because common things happen**
22  **commonly. The overwhelming majority of the time,**
23  **somebody with Mr. Wheeler's symptoms and signs is**
24  **going to do just fine. You can't -- you can't**
25  **evaluate every patient for every symptom, for every**

Page 88

1  **sign.**
2      Q. Okay. So you don't think that Tyler Wheeler
3  needed a CT scan to assess his head injury based on
4  the signs and symptoms between 8:00 and 8:50 p.m.?
5      **A. Agreed. If he had crossed the line to**
6  **lethargy, if he had crossed the line into stupor, if**
7  **he'd crossed the line into coma, absolutely, he needs**
8  **a CAT scan. But as long as he remains alert -- he's**
9  **talking, he's interacting with the prison personnel,**
10  **he's still alert -- and for alert patients,**
11  **neurosurgeons just keep an eye on them.**
12      Q. Okay. So someone who is slumping in a chair
13  and sliding to the ground is alert to you?
14      **A. Yeah, he is alert. He's -- he's -- he's**
15  **interacting. He's exchanging sentences. He's**
16  **conversing. We -- we can all agree that there were --**
17  **that there were some concerns that he was worse, but**
18  **as long as you're alert, that's the safety cushion,**
19  **and providers would just keep a closer eye on him.**
20      Q. Okay. But do you see where I'm kind of
21  getting a little stuck up here? Because what you're
22  telling me is there's this red line. Once they cross
23  it, they're never returning to normal -- neurological
24  normal.
25      **A. Exactly.**

Page 89

1      Q. Right. Now, in that context, though, the
2  signs of this -- crossing this line are the same ones
3  of when you send someone to the hospital for you?
4      **A. Yeah. There's no way they could have seen**
5  **that red line coming between 9:00 and 10:00.**
6      Q. Okay. But he's got pressure in his head,
7  pain in his head, nausea, rebleeding, blood in his
8  ear, change in alertness, hazier over time, slumping
9  in his chair, head tilting, falling to the floor, not
10  looking good, and needs a wheelchair to walk.
11      **A. Yeah. I know -- I know those sound very**
12  **concerning, but I've been covering emergency rooms for**
13  **over 40 years, and that scenario is a dime a dozen.**
14  **Most of those patients do fine.**
15      Q. Okay. So if you had that patient come into
16  the ER, what would you do with that patient?
17      **A. Tell the nurse to keep a closer eye on him,**
18  **and if he became lethargic, to send him for a CT scan.**
19      Q. You would not order a CT scan if you had a
20  patient present in the context of a head trauma in the
21  ER with these symptoms?
22      **A. No. Again, we see altercations all the time.**
23  **As long as the patient is alert and interacting, they**
24  **can be observed. They should be -- they shouldn't be**
25  **sent home. That would be outside the standard of**

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 90

1  **care. But they should be kept there and observed, and**
2  **if you go from alert to lethargic, stuporous, or**
3  **comatose, stat CT.**
4      Q. All right. I just want to -- I want to get
5  this clear for the record. Okay? So your testimony
6  is: A patient presents in a context of a head trauma
7  with pain in their head, pressure in their head,
8  nausea, bleeding nose, blood in ear, change in
9  alertness over time, appearing hazy over time, they
10  slump in a chair and slide out of the chair onto the
11  floor, their head is tilting, they have reports from
12  witnesses that they're not looking good, and they need
13  a wheelchair to walk, and your testimony is that you
14  would not order a CT scan for this patient in the ER?
15      **A. You've asked me that question two or three**
16  **times. My answer continues to be the same: Closer**
17  **surveillance, keep an eye on them, if his level of**
18  **consciousness changes, get a CAT scan.**
19      Q. Okay. And I just want to get an affirmative
20  answer. You would not order a CT scan in that
21  context?
22      **A. Correct.**
23      Q. I want to take a look at the MRI here. Let
24  me know when you see the screen.
25          MR. WALKER: I think we are on -- what is

Page 91

1  this -- it would be Exhibit --
2          THE REPORTER: 11.
3          MR. WALKER: -- 11?
4      (Exhibit 11 marked for identification.)
5      Q. (By Mr. Walker) Can you see that? Is it
6  sharing?
7      **A. Yes.**
8      Q. All right. And you can see this is an MRI,
9  correct?
10      **A. Yes.**
11      Q. And it's of -- I think it -- I don't see
12  Tyler Wheeler's name on here, but it's taken on
13  November 14, 2018.
14      **A. It actually says the patient's name is**
15  **Patrick Johnson.**
16      Q. Oh, I'm sure that's just a mistype, because
17  this is from Tyler Wheeler's medical record. Do you
18  dispute that this is from Tyler Wheeler's medical
19  record?
20      **A. No idea.**
21      Q. And here in terms of the findings, it says,
22  "Scattered infarcts in the high left
23  frontoparietal" -- I can't say that -- "region as
24  well. There are punctate foci of infarcts scattered
25  elsewhere in the right insula and high right frontal

Page 92

1  lobe." Do you see that?
2      **A. Yes.**
3      Q. And then in the impression it says,
4  "Extensive infarcts within the brain," correct?
5      **A. Yes.**
6      Q. What's an infarct?
7      **A. Dead brain.**
8      Q. Okay. And why does Tyler Wheeler have dead
9  brain?
10      **A. Because of his epidural hematoma.**
11      Q. And why?
12      **A. It puts pressure on the brain, and the**
13  **pressure rises to the point where the brain tissue**
14  **dies.**
15      Q. And why is the brain tissue dying because of
16  the increased pressure?
17      **A. Yeah, that's a good question. I have no**
18  **idea.**
19      Q. You have no idea?
20      **A. Yeah. I mean, it's more common sense than**
21  **medicine. If something is compressed enough, it's --**
22  **it's going to stop working. It's going to get**
23  **destroyed. So it's the same with the brain.**
24      Q. Okay. And, you know, let's take a look at
25  the operative report. On the operative report --

Page 93

1  we'll make this Exhibit 12.
2      (Exhibit 12 marked for identification.)
3      Q. All right. And can you see the operative
4  report now?
5      **A. Yes.**
6      Q. And I highlighted below where it talks about,
7  "Upon removing the craniotomy flap the very large AEDH
8  became visible" -- and before I go on, AEDH, that's
9  the epidermal -- epidural hematoma, right?
10      **A. Yes.**
11      Q. And then the op report continues, "it was
12  spontaneously extruded from the cranial activity. The
13  hematoma was removed, active arterial pumping was
14  noted coming from the depth of the temporal fossa."
15  Do you see that?
16      **A. Yes.**
17      Q. So at the time of Tyler Wheeler's surgery,
18  his artery is still actively bleeding, correct?
19      **A. Yes.**
20      Q. So it's been bleeding since the initial
21  trauma, correct?
22      **A. That's -- no one can say. I don't know when**
23  **it started bleeding.**
24      Q. Okay. Well, if it didn't start -- if it
25  didn't start developing -- if it didn't tear his

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 94

1  artery with the, you know, initial insults, I know you
2  can't say whether it was the fight or the concrete,
3  but we know that there's events that happened that
4  traumatized his head around 8 -- or 7:45 p.m., right?
5      MR. ORTIZ:  Object --
6  A. There's likely --
7      MR. ORTIZ:  -- to form.
8  A. -- I mean, he kind of crashed, basically,
9  between 9:00 and 10:00.  That's likely when that
10 artery opened up.
11 Q. So your testimony is that the artery didn't
12 open up until about 9:00 p.m.?
13 A. I said between 9:00 and 10:00; that's
14 correct.  That's when he crashed clinically.  He went
15 from alert to comatose.
16 Q. Okay.  I know.  I know.  But I want to
17 understand when did the artery -- artery start
18 bleeding?
19 A. There's -- there's no way of knowing.  I'm --
20 I'm just basing that on being a neurosurgeon for 40
21 years, because he goes from alert to comatose in a
22 very short time, under an hour, so that's likely the
23 time when the artery started bleeding.
24 Q. So why was he having decreasing function
25 between 8:00 and 9:00 p.m. if it wasn't due to the

Page 95

1  epidural hematoma?
2      MR. ORTIZ:  Objection.
3  A. Oh, he was still alert, and he had this and
4  that because he had just been in a very violent
5  altercation.
6  Q. So what at 9:00 is causing his artery to
7  bleed?
8  A. Arteries can open up at any time.
9  Q. So your testimony is that Tyler Wheeler's
10 artery opened up spontaneously around 9:00 p.m., and
11 that's when the bleed started?
12 A. Right --
13     MR. ORTIZ:  Objection, form.
14 A. -- something happened at quarter of 8:00 when
15 he was in the altercation.  I have no idea what.  And
16 for whatever reason, between 9:00 and 10:00, the
17 artery opened up and caused his rapid decline.
18 Q. And what what's this based on?
19 A. Being a neurosurgeon for 40 years.  I am
20 really confident you would not find an article in the
21 medical literature that would answer that question.
22 Q. I know.  But what -- I mean, I guess, even
23 factually, what is this based on?
24 A. I just said, being a neurosurgeon for 40
25 years.  Someone crashes from alert to comatose in --

Page 96

1  in a matter of minutes, that's when the bleeding
2  started, common medical sense.
3  Q. How do you know the bleeding didn't start
4  before that?
5  A. I don't.
6  Q. Okay.  Okay.
7      THE REPORTER:  Doctor, I'm having a hard
8  time hearing objections.
9      THE WITNESS:  There haven't been any.
10     THE REPORTER:  There have, I think,
11 actually.
12     MR. ORTIZ:  I objected to a few, Doctor.
13 That's -- I think that's her way or saying pause for a
14 moment between when the question is asked and when you
15 start your answer.
16     THE WITNESS:  Okay.
17 Q. (By Mr. Walker) Doctor, so your testimony is
18 that if he had received surgery earlier, it would not
19 have made any difference, not one iota of difference,
20 in his neurological income -- outcome?
21     MR. ORTIZ:  Objection, form.
22 A. Well, given the time it took him to -- to get
23 from the house of corrections to the hospital and get
24 the operating room ready in the middle of the night,
25 it would have made no difference.  If he had -- if he

Page 97

1  had been sent to the ER at the time of the
2  altercation, we'll say 8:00 p.m., it would have made
3  no difference.
4  Q. At 8:00 p.m., it would have made no
5  difference?
6  A. Correct.
7  Q. And why is that?
8  A. Because he'd already crossed -- he crossed
9  the red line, you know, of -- of being comatose
10 well -- you know, hours before he would have gotten
11 into the operating room.
12 Q. Okay.  Do you know if the time in which he
13 would have gone into the operating room would have
14 been different had trauma been alerted?
15 A. Yeah, roughly -- you know, the -- the
16 decision to send him to the hospital was made at about
17 10:00, and I'm going under the assumption that
18 everything possible was done to get him to the
19 hospital, to get him operated on as soon as possible.
20 You know, given that time frame, if he had been sent
21 to the ER at 8:00 p.m., he would have had the same
22 outcome.  He would have crossed the red line of coma
23 by then.
24 Q. Have you reviewed the 911 -- well, it wasn't
25 a 911 call.  Did you review the call requesting an

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 98

1  ambulance?
2      **A. Not that I recall.**
3      Q. All right. Did you know that the call
4  requesting an ambulance was made to a nonemergency
5  line?
6      **A. No, not that I -- I don't recall looking at**
7  **that document.**
8      Q. Okay. And did you listen to the call for --
9  requesting the ambulance?
10     **A. No.**
11     Q. Did you know that the -- the call requesting
12 an ambulance -- for a concussion evaluation?
13     **A. No.**
14     Q. Now, in your experience of working in an
15 emergency room, there are different trauma alerts,
16 correct?
17     **A. Certainly.**
18     Q. And you get these alerts from prehospital
19 management, correct?
20     **A. Once again, please.**
21     Q. Well, you get these alerts based on the
22 prehospital management, maybe EMS or the person on the
23 scene reporting --
24     **A. Yes.**
25     Q. -- right? So if someone calls 911 and 911

---

Page 99

1  hears what's going on, and they say, "Oh, this is this
2  severe of a trauma" or "not a trauma," and -- they
3  alert the hospital, correct?
4      **A. Yeah, I don't -- I don't take those calls.**
5  **The triage nurse does. But what you say, in general,**
6  **is correct.**
7      Q. And if it's a -- if a neurosurgeon is needed
8  potentially, they'll call -- they'll say, "Hey,
9  neurosurgeon, we might have a patient with a head
10 trauma coming in," right?
11     **A. That's uncommon. We usually don't get**
12 **alerted until after the patient is at the ER and been**
13 **assessed. But on rare occasion, there -- you know, I**
14 **might get alerted ahead of time.**
15     Q. Have you ever worked in a rural hospital,
16 like rural New Mexico?
17     **A. No.**
18     Q. Do you know how far it is from the hospital
19 to the correctional facility?
20     **A. No.**
21     Q. Do you know what kind of staffing they have
22 at the hospital for neurosurgery?
23     **A. No.**
24     Q. Do you know what is needed, you know, in
25 terms of their alert system, in terms of getting the

---

Page 100

1  neurosurgeon present to assess patients? Do you know
2  how that -- policies and how that works there in
3  southern New Mexico?
4          MR. ORTIZ: Objection, form.
5      **A. I kind of know. It is kind of a national**
6  **standard that if you're a specialist on call at an ER,**
7  **you have to be able to get there in under an hour.**
8      Q. Do you have an opinion regarding whether or
9  not, if trauma had been alerted earlier, that could
10 have increased the speed at which Tyler Wheeler was --
11 underwent surgery?
12     **A. I don't know.**
13     Q. You don't know. Okay. So you don't know if
14 trauma --
15     **A. I'm under the assumption that from the time,**
16 **you know, emergency medical services were called at**
17 **10:00 to the time he was operated on, which was around**
18 **1:00 in the morning, that everything was done as**
19 **quickly as possible.**
20     Q. And if that assumption is incorrect, then
21 what -- how does that impact your testimony?
22         MR. ORTIZ: Objection, form.
23     **A. In this context, it wouldn't. He passed the**
24 **red line, and he -- his outcome was vegetative or**
25 **dead, no matter what happened, even if he had been**

---

Page 101

1  sent, you know, directly from the scene of the
2  altercation to the hospital.
3      Q. Is it your testimony that there's no
4  difference in treating a patient who suffers -- let's
5  say once they have a midline shift, is it your
6  testimony that they'll have no difference in brain
7  function whether you do surgery within an hour versus
8  five hours? They'll still be neurologically the same?
9      **A. It depends on the -- on the neurological**
10 **examination at the time of the surgery.**
11     Q. I understand. But let's just say for Tyler
12 Wheeler's sake --
13     **A. If you're comatose -- if you're comatose at**
14 **the time of surgery, you're beyond the red line no**
15 **matter who you are.**
16     Q. What would have happened if Tyler Wheeler
17 didn't get surgery?
18     **A. He probably would have died sometime the next**
19 **day.**
20     Q. So if his bleeding was allowed to continue
21 or -- and it went untreated, he would have died,
22 correct?
23     **A. Probably.**
24     Q. So to die, there has to be a change in the
25 brain, correct?

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.                    Stephen C. Saris, M.D.
No. 1:21-CV-01027-JB-GBW                                          October 10, 2023

Page 102

1    A. Yeah, a certain -- a certain part, a certain
2  amount of the brain needs to be damaged before you
3  die.
4    Q. So over time, the longer he's going without
5  treatment, the more damage that is occurring, correct?
6    A. Yes.
7    Q. Because at some point, there will be enough
8  damage that he dies?
9    A. Yes.
10   Q. So from the point of, you know, even coma to
11 the point when he's dying, there are changes happening
12 in the brain and more damage occurring, correct?
13   A. Oh, he was dying when he went into a coma.
14   Q. I understand. But I'm just saying, from the
15 point he goes into a coma to the point that
16 potentially he would have died, there would have been
17 changes happening in his brain, correct?
18       MR. ORTIZ: Objection, form.
19   A. Yes. Presumably, the brain is being more
20 many and more damaged.
21   Q. So over time, more and more brain is being
22 damaged until the point the patient dies?
23   A. Agreed.
24   Q. And -- okay.
25       MR. WALKER: All right. Why don't we

Page 103

1  take a break?
2        MR. PARK: Can we take --
3        THE WITNESS: -- take a break?
4        THE VIDEOGRAPHER: Off the --
5        MR. WALKER: I need to --
6        THE VIDEOGRAPHER: -- record --
7        MR. WALKER: -- Dr. Saris, so we're going
8  to take a break.
9        THE VIDEOGRAPHER: Off the record at
10 1:09 p.m.
11   (Recess taken from 1:09 p.m. to 1:24 p.m.)
12       THE VIDEOGRAPHER: On the record at
13 1:24 p.m.
14   Q. (By Mr. Walker) All right. Dr. Saris, I'm
15 going to -- I think we're on Exhibit 13. Are you
16 familiar with Advanced Trauma Life Support?
17   (Exhibit 13 marked for identification.)
18   A. In vague terms.
19   Q. Okay. Do you realize that Advanced Trauma
20 Life Support is a -- basically a set of standards and
21 guidance published by the American College of
22 Surgeons?
23   A. If that's what it is, then I have to change
24 my answer in that I have no idea what it is.
25   Q. You never heard of Advanced Trauma Life

Page 104

1  Support, even though you work in an ER?
2    A. Correct.
3    Q. All right. Is your testimony today that your
4  ER does not apply the principles of Advanced Trauma
5  Life Support?
6    A. I have no idea.
7    Q. Okay. What ER do you work at?
8    A. Brigham and Women's Hospital and also
9  St. Joseph's Hospital.
10   Q. So you had no idea that this is the
11 nationally accepted standard for trauma response and
12 identification?
13   A. Yeah --
14       MR. ORTIZ: Objection to the form.
15   A. -- I really don't know. You'd have to ask
16 one of the ER docs.
17   Q. So an ER doc would know better than -- than
18 you on this front?
19   A. Yes.
20       MR. ORTIZ: Objection, form.
21   Q. I just want to -- so I'm just going to show
22 you this. We're going to make this Exhibit 13. This
23 is Advanced Trauma Life Support, and you can see down
24 here, it's published by the American College of
25 Surgeons. And I'm going to go to chapter -- I'm

Page 105

1  pulling up here chapter 6 for you, which is head
2  traumas. Do you see that?
3    A. Yes.
4    Q. And right here, at the -- the first thing it
5  says, just right as in the subheading of its chapter,
6  it says, "The primary goal of treatment for patients
7  with suspected traumatic brain injury is to prevent
8  secondary brain injury." Do you see that?
9    A. Yes.
10   Q. And what is secondary brain injury?
11   A. It's an interesting question. Let me read
12 that for a second.
13       Yeah, I don't agree with that statement. I
14 mean, the primary goal in treatment for patients with
15 suspected traumatic brain injury is to treat the
16 primary injury, which is the traumatic brain event.
17   Q. And why would you want to treat the primary
18 injury?
19   A. To minimize the damage to the brain.
20   Q. Okay. And do you understand that secondary
21 brain injury is damage done to the brain because it --
22 the injury goes -- the primary injury goes untreated?
23   A. I'm not -- I'm not familiar with that
24 concept, and my answer to your question is: I don't
25 know. If someone's got a clot inside their brain, the

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 106

1 goal is to remove the clot. If they have a
2 penetrating shrapnel injury, you remove the shrapnel.
3    Q. I'm going to go -- well, we -- we already
4 talked about this. This is on page 104. We already
5 talked about the primary goal of treatment for
6 patients with suspected TBI is to prevent secondary
7 brain injury, which you maybe disagree, maybe don't,
8 aren't familiar with that concept?
9    A. Agreed.
10    Q. So then it says down here -- I want to go to
11 what I highlighted -- it says, "After managing the
12 ABCDEs" -- I guess I should ask, do you know what the
13 ABCDEs are?
14    A. Well, ABC is pretty standard: airway,
15 breathing, circulation. I have no clue what D and E
16 are.
17    Q. All right. So, "After managing the ABCDEs,
18 patients who are determined by clinical exam to
19 have head trauma and require care at a trauma center
20 should be transferred without delay."
21    A. Agreed.
22    Q. You see that? Do you agree with that
23 statement?
24    A. Well, actually let me back up on that. So,
25 "who are determined by clinical exam to have head

Page 107

1 trauma" . . . . Well, it basically says that if they
2 require care at a trauma center, they should be at a
3 trauma center. Sure, I agree with that.
4    Q. So you agree with that, "patients who are
5 determined by clinical examination to have head trauma
6 and require care at a trauma center should be
7 transferred without delay"?
8    A. Yeah, if -- if someone should be at a trauma
9 center, they should be at a trauma center. But not
10 all patients with head strikes need to be at a trauma
11 center.
12    Q. Then it says, "CT scanning should not delay
13 patient transfer to a trauma center that is capable of
14 immediate" -- "immediate and definitive neurologic" --
15 "neurosurgical intervention," correct?
16    A. Let me look at that for a second.
17       MR. ORTIZ: Objection, form.
18    A. "CT scanning should not delay patient
19 transfer." CT scanning should not delay patient
20 transfer to a place where you have a neurosurgeon.
21    Q. That's not what it says. It says, "CT
22 scanning should not delay patient transfer to a trauma
23 center that is capable of immediate and definitive
24 neurosurgical intervention."
25    A. Yeah, that's --

Page 108

1       MR. ORTIZ: Objection, form.
2    A. I disagree. I think it means that -- to a
3 place that has a neurosurgeon. No, I disagree with
4 that statement.
5    Q. Okay. And do you disagree with the
6 statement, "Consult with a neurosurgeon early in the
7 course of treating it"?
8    A. It depends. I mean, if you just have
9 somebody bump their head on a cupboard, you don't need
10 a neurosurgeon. It depends on the clinical situation.
11    Q. Right. This is suspected TBI; we're talking
12 that context.
13    A. The overwhelming majority of TBIs are not
14 seen by a neurosurgeon.
15    Q. I know. You're saying that providers
16 shouldn't consult with a neurosurgeon when they
17 suspect TBI.
18    A. Correct. The -- the overwhelming number of
19 TB- -- patients with TBIs never see a neurosurgeon.
20    Q. Okay. All right. Let's scroll down here to
21 "Intracranial Pressure." Do you see that?
22    A. I do.
23    Q. It says, "Intracranial Pressure," and it
24 says, "Elevation of intracranial pressure (ICP) can
25 reduce cerebral perfusion and cause or exacerbate

Page 109

1 ischemia."
2    A. Agreed.
3    Q. What is cerebral perfusion?
4    A. Blood flow in the brain.
5    Q. Okay. And what is ischemia?
6    A. Lack of blood flow to the brain.
7    Q. Okay. So increased intracracial --
8 intracranial pressure can reduce blood flow in the
9 brain, correct?
10    A. Yes.
11    Q. And reduced blood flow in the brain can cause
12 or exacerbate ischemia, correct?
13    A. Yes.
14    Q. And say it one more time, what ischemia is.
15    A. Lack of blood flow.
16    Q. All right. Let's scroll down here. Go past
17 that.
18       All right. In the Advanced Trauma Life
19 Support, they say to do a Glasgow Coma Scale when
20 evaluating a patient. Do you disagree?
21    A. Yes. It depends on the circumstances.
22    Q. Okay. Under what circumstances should you
23 perform a Glasgow Coma Scale?
24    A. When it's a -- when it's deemed to be a
25 serious versus non serious injury.

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 110

1    Q. Okay. How do you deem that without doing the
2 Glasgow Coma Scale?
3    **A. Generally, level of consciousness. If**
4 **somebody is alert and seems like they're okay, then**
5 **you don't need to do it. If someone is lethargic,**
6 **stuporous, or comatose, you should do it.**
7    Q. Okay. How do you know their level of
8 alertness without doing a Glasgow Coma Scale?
9    **A. It's the other way around. The --**
10 **determining the level of consciousness, whether the**
11 **best motor, best eye, best verbal, which is what a GSC**
12 **is, you do the level of consciousness first to**
13 **determine whether or not they need a GCS evaluation.**
14    Q. Okay. Now, this is just -- I'm going to say
15 what the Advanced Trauma Life Support says. It says,
16 "The Glasgow Coma Scale is used as an objective
17 clinical measure of the severity of brain injury." Do
18 you see that?
19    **A. I agree.**
20    Q. Okay. And they don't put any kind of
21 condition on when and when not to do it?
22    **A. Agreed.**
23    Q. Okay. And let's see here. Let's scroll
24 up -- about when they talk about when you should do a
25 Glasgow Coma Scale -- or, you know what, it's going to

---

Page 111

1 be down this way. Actually, this is what they -- this
2 is actually how they start. This is classification of
3 head injuries. The first thing they have to start
4 with is: You should do a Glasgow Coma Scale to decide
5 the classification of the head injury. Do you see
6 that?
7    **A. No, I do not. It says, "GCS is used as an**
8 **objective clinical measure," blah, blah. It really**
9 **doesn't say when it should be done.**
10    Q. Let's see. All right. Well, let's start
11 here. It says right now for a -- "Mild traumatic
12 brain injury is defined by a post-resuscitation GSC
13 score between 13 and 15. Often these patients have
14 sustained a concussion, with a transient loss of
15 neurologic function."
16    I guess this isn't saying where it should be.
17    Do you see this line here, "Never ascribe
18 alterations in mental status to confounding factors
19 until brain injury can be definitively excluded"?
20    **A. Let me at that for a second. "Never**
21 **ascribe" -- yeah, I disagree. Things like "never,"**
22 **"always" -- it depends on the clinical circumstance.**
23    Q. Okay. Let me stop sharing. All right. Can
24 you point me to -- now, we talked earlier about how
25 long a cell can live without oxygen. Can you point me

---

Page 112

1 to the medical literature that supports that a brain
2 cell can live without oxygen for more than minutes?
3    **A. I mean, sure. I mean, I don't -- I don't do**
4 **these, but some of my partners do giant aneurysms**
5 **where basically the patient is dead while they're in**
6 **surgery. They're in cardiopulmonary shutdown. So**
7 **there -- there are circumstances in which you can -- a**
8 **cell cannot receive blood flow or oxygen for hours and**
9 **do just fine.**
10    **So, again, I stand by my former statement of**
11 **minutes to hours, but it depends on the circumstance,**
12 **you know -- you know, the body temperature, what kind**
13 **of cell, what kind of body? So minutes to hours is an**
14 **accurate framing.**
15    Q. Well, how does body temperature impact it?
16    **A. Oh, the -- if you're hypothermic, you know,**
17 **you can have no blood flow for a prolonged period of**
18 **time and thaw out and be normal. There are lots of**
19 **case reports like that, people who, you know, fall**
20 **through fish holes in January, stuff like that.**
21    Q. Okay. Now, the context that you're talking
22 about, these aneurysm surgeries, what is it about
23 those surgeries -- what are the conditions that allow
24 the cell to live for more than -- for up to an hour?
25    **A. Yeah, that -- let -- that's outside my lane.**

---

Page 113

1 **I haven't done that in years. But, basically, it --**
2 **it's done on -- on cardiac bypass. You bypass the**
3 **entire heart. You -- you chill the body down until**
4 **the patient is basically dead. And then -- and then**
5 **you do your surgery, and then you wake them up again.**
6    Q. Okay. So you're bypassing the heart. Are
7 you just redirecting blood flow to the brain then?
8    **A. No, you're kind of shutting down everything.**
9 **Again, I'm -- I'm outside my lane, but the -- but the**
10 **point is, you're basically -- your blood pressure is**
11 **zero during these surgeries. You do the surgery. You**
12 **clip the aneurysm. You wake the patient back up. So**
13 **generally, the -- the lower your body temperature, the**
14 **less the cells need oxygen and blood, and the longer**
15 **they will live without them.**
16    Q. Okay. So when you have a lower body
17 temperature, you can -- your cells can go with less
18 oxygen?
19    **A. Yeah, you can have a blood pressure of zero**
20 **and still survive for hours --**
21    Q. And so what temperature would your body need
22 to be at where now it can start functioning off less
23 oxygen?
24    **A. Yeah, I don't know the number.**
25    Q. Well, I need to know this, because you're

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 114

1  testifying that the cells can live for a certain
2  amount of time.  And to test the scientific validity
3  of this statement, I need to know:  What temperature
4  would your body need to be at to allow your blood --
5  your brain cells to live longer than a few minutes
6  without oxygen?
7          MR. ORTIZ:  Objection, form.
8      A.  Yeah, my -- my answer is I don't know.  In --
9  in -- in pretty much any circumstance you choose, the
10  cell will survive for minutes to hours.  Depends on
11  the circumstance.
12     Q.  In a person of normal body temperature and
13  there's no clinical -- you know, doctors aren't doing
14  anything to redirect blood or -- or mess with their
15  blood pressure or anything like that.  Just a normal
16  patient who their brain is not getting blood cell --
17  or getting blood, how long will those cells live?
18         MR. ORTIZ:  Objection, form.
19     A.  Minutes to hours.  Depends on the
20  circumstance.
21     Q.  Okay.  And what medical literature can you
22  direct me to to support your -- your position that a
23  patient, without any clinical intervention, their
24  cells will live for hours without oxygen?
25         MR. ORTIZ:  Objection, form.

Page 115

1      A.  These are references that I looked at when I
2  was a medical student at Boston University 40 years
3  ago.  My answer is:  I don't know.  I don't remember.
4      Q.  Okay.  So you cannot reference any medical
5  literature that states that a patient, without medical
6  innervation -- inter- -- intervention, that their
7  blood cells can live hours?
8          MR. ORTIZ:  Objection, form.
9      A.  Minutes to hours without a blood flow or
10  oxygen; that is correct.
11     Q.  And, again, I want to know what this opinion
12  is based on beyond -- what are you basing this opinion
13  on?
14         MR. ORTIZ:  Objection, form.
15     A.  Education, training, experience.
16     Q.  Okay.  How many times have you had a patient
17  -- can you point me then to a direct experience you've
18  had where a normal patient had their brain cells live
19  when being deprived of blood flow without any clinical
20  intervention?
21     A.  Yeah, that would be like me asking you what
22  you had to eat 35 meals ago.  I just don't know.
23     Q.  I know.  But you understand that it's harder
24  for me now to test the accuracy of your opinions if I
25  don't know what you're actually relying upon, other

Page 116

1  than, "I say so?"
2      A.  Yeah, there are certain things that are just
3  medical common sense, and this is one of them.  Any
4  doctor --
5      Q.  This --
6      A.  -- you talk to would give you the same -- the
7  same answer:  Minutes to hours.  Depends on the
8  circumstance.
9      Q.  If it was common sense, then this would
10  appear in the medical literature, correct?
11     A.  Yeah, I'm sure there are some -- there are
12  some citations on the subject.
13     Q.  Okay.  And so when I pull up the American
14  Association of Neurological Surgeons, they said a few
15  minutes, that the tissue would start to die in the
16  brain without blood flow.  So if it was common sense
17  that it could live to hours, why wouldn't they say
18  hours in their web page?
19         MR. ORTIZ:  Objection --
20     A.  Well, I saw a number --
21         MR. ORTIZ:  -- foundation.
22     A.  -- I see a number of things in -- in that
23  reference you're referring to that I disagree with.
24  You know, if you look at the definition of a few, what
25  does a few mean?  A few means generally more than

Page 117

1  three and less than many.  That begs the question,
2  what does many mean?  To me, it means hours, minutes
3  to hours.
4      Q.  Okay.  So you -- otherwise, you can't point
5  me to any -- any medical literature?
6          MR. ORTIZ:  Objection --
7      A.  Correct --
8          MR. ORTIZ:  -- form.
9          THE REPORTER:  What was your answer?
10         THE WITNESS:  The -- the answer -- oh,
11  I -- oh, I did it again, didn't I?  I'm sorry.
12         The answer is:  I haven't read that stuff
13  since medical school.  So the answer is:  I don't
14  recall.
15     Q.  (By Mr. Walker) And you can't -- you can't
16  tell me the name of these articles?
17     A.  No.  For --
18         MR. ORTIZ:  Objection --
19     A.  -- the fourth or --
20         MR. ORTIZ:  -- form.
21         THE WITNESS:  I'm sorry.
22     A.  Okay.  For the fourth or fifth time, no.
23     Q.  Thank you.  Can you tell me any articles that
24  say -- talk about spontaneous rupture of the meningeal
25  artery?

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 118

1    A.  No, that's pretty basic stuff for any
2  neurosurgeon.
3    Q.  That the meningeal artery can spontaneously
4  rupture?
5    A.  Oh, spontaneously rupture without any trauma?
6  Oh, that would be quite -- quite extraordinary.
7    Q.  Then maybe I'm a little confused on your
8  testimony about Tyler Wheeler, that his hematoma
9  didn't develop until 9:00 to 10:00 p.m. or that
10  bleeding didn't start until 9:00 to 10:00 p.m.  Can
11  you explain to me how the bleeding started at 9:00 or
12  10:00 p.m. if it's extraordinary for something to
13  spontaneously rupture?
14      MR. ORTIZ:  Objection to form.
15    A.  I never said it was spontaneous.  It's
16  related to his altercation and his beating by the
17  other inmate.
18    Q.  Well, no --
19    A.  It could have started at, you know, 8:20
20  versus 8:50 versus 9:20 versus 9:53.  I have no idea.
21  But the evidence is, it didn't really let loose until
22  between 9:00 and 10:00 when he crashed.
23    Q.  Okay.  What do you mean, it didn't let loose?
24  What didn't let loose?
25    A.  The artery.

---

Page 119

1    Q.  The artery.  Was his artery bleeding from the
2  time he suffered the -- the insult to his head?
3    A.  No.  The evidence is that sometime between --
4  I get these times right -- sometime between 9:00 and
5  10:00, it opened up.
6    Q.  Okay.  So what caused it to open up between
7  9:00 and 10:00?
8    A.  No idea.
9    Q.  Because there was no trauma in the -- in the
10  record of anything happening between 9:00 and
11  10:00 p.m., correct?
12    A.  Agreed.
13    Q.  Okay.  And you testified that it's quite
14  extraordinary for an artery to spontaneously rupture,
15  correct?
16    A.  Correct.
17    Q.  So then what -- I -- I guess, what then -- or
18  what are you saying then?
19    A.  You're playing that the doctors know the
20  answers to everything.  I don't.  All I can know is
21  that it's a common scenario for someone to have head
22  trauma and an hour later, hour and a half later, two
23  hours later, three hours later, that's when they --
24  they crash, as Mr. Wheeler did.
25    Q.  I understand --

---

Page 120

1    A.  Probably --
2    Q.  -- that --
3    A.  -- they crashed when the artery started
4  bleeding.  Why the artery started bleeding at time X
5  or time Y or time Z, I just don't know.
6      MR. WALKER:  Okay.  That's all my
7  questions for you.  I pass the witness.
8      MR. PARK:  Thanks, Sam.
9      Tony, do you want to go ahead, or do you
10  want me?
11      MR. ORTIZ:  I'll start.  Thank you.
12      MR. PARK:  Okay.
13      EXAMINATION
14  BY MR. ORTIZ:
15    Q.  Dr. Saris, hello.  Tony Ortiz here.
16      Doctor, you were asked some questions about
17  your opinion, and I'm specifically referring to page 8
18  of 19, and I just want to confirm your opinion as
19  written.  So I'm going to read this to you and ask if
20  it reflects your -- your opinion as it still exists
21  here.
22      "It is my opinion that the altercation and
23  head strike on November 10, 2018, from the other
24  inmate caused Mr. Wheeler's EDH and ultimate brain
25  damage."  Does that remain your opinion to a

---

Page 121

1  reasonable degree of medical certainty in this matter?
2    A.  Yes.
3      MR. ORTIZ:  No further questions, Al.
4      MR. PARK:  All right.  Thanks, Tony.
5  You're quick.
6      Okay.  Dr. Saris, I'll see if I can be as
7  fast as Tony.  I did have a couple questions.
8      THE WITNESS:  Okay.  I've already
9  canceled my tennis match.
10      MR. PARK:  Oh, sorry.
11      THE WITNESS:  That's okay.
12      MR. PARK:  Just a couple questions.
13      EXAMINATION
14  BY MR. PARK:
15    Q.  So -- so, Dr. Saris, we got into the depo,
16  but we never really got into a little bit of your
17  background.  Can -- how long have you been a
18  neurosurgeon?
19    A.  I saw my first neurosurgical patient in 1979,
20  so over 40 years.
21    Q.  Okay.  And what does your practice typically
22  consist of?  What types of patients do you see?
23    A.  I see about -- when I was younger, I was more
24  of a brain doctor.  Now I'm more of a spine doctor.
25  So -- so currently, about three quarters of my

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

Page 122

1  practice is spine.  About one quarter is brain.
2      Q.  Okay.  And in your practice, have you
3  regularly seen and treated patients that present with
4  similar symptoms to Mr. Wheeler?
5      A.  Many times.
6      Q.  And -- and that -- that includes up through
7  and to today?
8      A.  Yeah, I still cover the emergency room a
9  hundred -- a hundred days a year, plus or minus.
10     Q.  And then I'm going to jump ahead to page 11
11 of 19 of your -- of your expert report.  You have
12 written the opinion -- sorry.
13         Okay.  I want to talk about two things, which
14 is -- the first opinion that I want to ask you about
15 on page 11 of 19, you write, "If Dr. Andrade had
16 ordered emergency transfer at 8:40 p.m., Mr. Wheeler's
17 outcome would have been the same."  And then you note,
18 "Dr. Andrade ordered emergency transfer at 9:40 p.m.
19 Mr. Wheeler's surgery was 4 hours later at 1:30 a.m.
20 As per the medical literature as well as my education,
21 training and experience, Mr. Wheeler was past the
22 point of neurological recovery by 9:40 p.m." -- or --
23 I think that's a typo.  "As such, an earlier transfer
24 would have made no difference."
25         So I think you meant by 8:40.  So is -- am I

Page 123

1  right on that, that you meant 8:40 and not 9:40?
2      A.  Yeah, you have to show me the document, I'm
3  afraid.
4      Q.  Okay.  Let me see.  I'm not as good on the
5  computer as Sam is.
6         MR. PARK:  Sam, do you have that by any
7  chance?  If not, you'll have to give me about two
8  minutes, three minutes to pull it up.  It's your
9  Exhibit -- you made his report -- which is, I think,
10 Exhibit 4.
11         MR. WALKER:  Sure.
12         MR. PARK:  Thank you, Sam.  I appreciate
13 it.
14         MR. WALKER:  We're talking about his
15 report, right?
16         MR. PARK:  Yes, please.  And I apologize.
17 I should have been better prepared, but I freely admit
18 that I'm a bit of a Luddite.
19         MR. WALKER:  You're fine.
20         MR. PARK:  Just scroll down a little bit.
21 You're -- you're just a -- right there.  Thank you
22 that's it.
23     Q.  (By Mr. Park) Do you see that, Dr. Saris,
24 where it says the opinion?
25         MR. PARK:  I appreciate you, Sam.  Thank

Page 124

1  you.
2      A.  If you can ask me the question again, I'd
3  appreciate it.
4      Q.  (By Mr. Park) Sure.  So here it says on line
5  241 of your -- of your report -- it says, "Dr. Andrade
6  ordered the emergency transfer" -- well, let me start
7  off -- at 238 it says, "If Dr. Andrade had ordered
8  emergency transfer at 8:40 p.m., Mr. Wheeler's outcome
9  would have been the same."  And then you write,
10 "Dr. Andrade ordered emergency transfer at 9:40 p.m.
11 Mr. Wheeler's surgery was 4 hours later at 1:30.  As
12 per the medical literature as well as my education,
13 training and experience, Mr. Wheeler was past the
14 point of neurological recovery by 9:40 p.m.  As such,
15 an earlier transfer would have made no difference."
16 Did I read that right?
17     A.  Correct.  In round numbers, two hours after
18 the altercation, he was past the red line of
19 meaningful neurological recovery.
20     Q.  And -- and that is your testimony to a
21 reasonable degree of medical certainty?
22     A.  Yes.  In round numbers, by 10:00-ish p.m. On
23 that night, he had passed the red line.  His only
24 outcome would have been death or vegetation.
25     Q.  And to a reasonable degree of medical

Page 125

1  certainty, do you believe that Dr. Andrade should have
2  transferred Mr. Wheeler to the emergency room prior to
3  making the call at 9:40 p.m.?
4      A.  I -- I -- if I'd been on call for the prison,
5  I would have done the same as Dr. Andrade did.  The
6  only thing I would have done would have been to tell
7  the nurse to keep a closer eye on him.
8      Q.  So is it your testimony, then, that by
9  waiting until 9:40 to order the -- the transfer, that
10 Dr. Andrade did not violate the standard of care?
11     A.  Correct, he did not violate the standard of
12 care.  He told the nurse exactly what I would have
13 told her.
14     Q.  And that's the same -- and -- and I'm going
15 back now.  I'm just going to jump through.  And you
16 testified earlier upon Mr. Walker's examination that
17 the result would have been the same even if an
18 ambulance had been called at 8:00 p.m. when he first
19 appeared in medical.  Do you remember that?
20     A.  Yes.
21     Q.  Okay.  And can you explain to me -- I just
22 wasn't entirely clear when you said he's past the --
23 the point of no return, past the red line.  How do you
24 know at 8:00 p.m., he's past the red line?
25         MR. ORTIZ:  Objection, form.

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 126

1    A. No, I said 10:00 p.m., he's past the--
2    Q. I'm sorry, at 10:00 p.m., but --
3    A. Because he's comatose with a -- with a blown
4 pupil.
5    Q. Okay.
6    A. And study after study after study shows that
7 when you're comatose at the time of surgery, you're
8 going to do horribly. You're going to end up a
9 vegetable, or you're going to die.
10    Q. And so let me just ask you then. You know,
11 Mr. Walker made a big point out of the fact that after
12 Mr. Wheeler was transferred to the library so that he
13 could get -- so that he could be separated from the
14 other individual that he was having the altercation --
15 that he started to experience pressure in his head.
16 Should the experiencing pressure in his head to -- in
17 your experience, in your testimony, in your expert
18 testimony, should Mr. Wheeler's experiencing pressure
19 of the head have necessitated calling an ambulance or
20 sending him to the emergency room?
21    A. You know, I've covered emergency rooms for
22 decades, and I think we can all agree that Mr. Wheeler
23 had the -- had the heck beaten out of him. So the
24 fact that he had -- he had headaches or pressure, to
25 me, is meaningless. You know, in -- in -- in that

Page 127

1 context, it's a frequent -- a frequent symptom that --
2 that does not worry me at all.
3    Q. And what about the bloody nose?
4    A. Same answer.
5    Q. And feeling nauseous?
6    A. Same answer. If -- if you take 100 people
7 who have gotten the heck beat out of them, who are --
8 who show up in the emergency room, those symptoms are
9 a dime a dozen.
10    Q. Okay. So by not calling for an ambulance at
11 8:00, Dr. Andrade and Nurse Hudson -- is it your
12 testimony that they did not violate the standard of
13 care?
14    A. Correct. And -- you know, it's -- it's
15 important to keep your eye on the ball and sweep away
16 the background noise. And the ball in this case is
17 the level of consciousness. If -- if Mr. Wheeler had
18 been on the floor, like unconscious, and they're
19 shaking him and saying, "Hey, wake up," and he goes,
20 "Oh," like that, that has my full attention. Stat CT,
21 if you can do it, stat transfer to the -- to the ER.
22 But that wasn't the case here. He remained alert, you
23 know, basically, you know, all that -- all that -- the
24 time that he was in the library.
25    Q. So laying on the floor and feeling unwell

Page 128

1 does not rise to the level of -- of urgency requiring
2 immediate transfer to the emergency room?
3    A. Correct, it does not. As long -- because he
4 continues to be alert. He's talking with the -- you
5 know, the personnel in the prison. He's -- he's later
6 talking with the nurse. She's doing his blood sugar.
7 They're checking his glucose. He's interactive and
8 awake. Until he becomes lethargic, he remains under
9 surveillance.
10    Q. All right. My next question: Do you know
11 why, after he was transported to the hospital, it took
12 more than three hours for Mr. Wheeler to have surgery?
13    A. I would assume that there are special
14 protocols when you're leaving a prison as opposed to,
15 say, a frat party. I assume that they take longer,
16 but, then, no, I don't know what those protocols are.
17    Q. Okay. So -- so just -- just to summarize
18 your testimony then, to a reasonable degree of medical
19 certainty, neither Dr. Andrade nor Nurse Hudson or
20 anyone in medical violated the standard of care and
21 treatment for Mr. Wheeler?
22    A. Yeah, I mean, across the board, you know, all
23 providers -- the personnel at the prison and so on,
24 nobody violated the standard of care. Everything they
25 did was reasonable. And from the doctor's standpoint,

Page 129

1 everything the doctor did is what I would have done.
2        MR. PARK: Okay. Thank you, Dr. Saris.
3 I have no further questions. I suspect that Sam
4 might.
5        Thank you again, Sam, for bringing this
6 up for me. I appreciate it.
7        MR. WALKER: Yeah. Dr. Saris, I do have
8 some questions.
9        EXAMINATION
10 BY MR. WALKER:
11    Q. Mr. Ortiz asked you about what caused the
12 skull fracture. You have not reviewed testimony or
13 statements regarding Tyler Wheeler's head being hit on
14 the concrete floor twice by a correctional officer,
15 correct?
16    A. No.
17    Q. And you were not giving opinions regarding
18 whether the assault by the other inmate or his head
19 hitting the floor on the concrete -- or his head
20 hitting the concrete floor twice, which one of those
21 caused his skull fracture, correct?
22        MR. ORTIZ: Objection, form.
23    A. Yeah, I can only comment on the -- on the
24 documents that I've seen, you know, which are the
25 depos, the videos, and so on. And -- and the only

---

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 130

1 **trauma I saw was inflicted by the other inmate.**
2 Q. Okay. Do you want -- I mean, I can play you
3 the statement. Do you want me to play you the
4 statement, so you can hear about Tyler Wheeler's head
5 being hit into a concrete floor?
6 **A. I don't know what the legal rules of**
7 **engagement are, but if -- if you're asking me if I**
8 **read any reports or depos talking about Udero beating**
9 **him up, basically, the answer is no.**
10 Q. If -- okay. Accepting that as a true fact,
11 that Correctional Officer Udero hit Tyler Wheeler's
12 head on the concrete floor twice, can you tell me if
13 the concrete floor or the punches caused the skull
14 fracture?
15 **A. Right, that gets into more -- that's more**
16 **forensic pathology than neurosurgery. I mean, you**
17 **know, if you take a guy's head and slam it into the**
18 **floor as opposed to punching him, as opposed to**
19 **hitting his head, which is more likely to cause an**
20 **epidural hematoma? I have no idea. That's not**
21 **neurosurgery. That's forensic pathology.**
22 Q. All right. And I'm sorry. I just need a
23 clear answer on this one, just direct. You're not --
24 **A. Oh, sure.**
25 Q. You're not going to testify whether the

---

Page 131

1 punches or his head hitting the concrete floor was the
2 cause of his skull fracture and resulting hematoma,
3 correct?
4 **A. Yeah, I'm not.**
5 MR. WALKER: Okay. And I have no further
6 questions. Thank you very much.
7 MR. ORTIZ: Okay. Doctor, I have just
8 one follow-up.
9 THE WITNESS: Sure.
10 MR. ORTIZ: Sorry about that.
11 THE WITNESS: One more question.
12 MR. ORTIZ: Yeah. One more question.
13 THE WITNESS: That's okay.
14 EXAMINATION
15 BY MR. ORTIZ:
16 Q. So in this instance, the Plaintiff's expert
17 has opined that the only way that -- that Mr. Wheeler
18 could have sustained the brain trauma in this instance
19 was from actions taken by Mr. Udero versus -- and that
20 they could not have been sustained by the -- by the
21 battery that -- that he suffered from the other
22 inmate. Would you be -- would you agree with that?
23 Would you be able to say that that's a valid
24 neurological conclusion?
25 MR. WALKER: I'm going to -- Dr. Saris,

---

Page 132

1 before you answer --
2 THE WITNESS: Melissa, I promise I'll
3 stop.
4 MR. WALKER: You're okay. -- I'm going
5 to object to form and foundation.
6 Q. (By Mr. Ortiz.) Go ahead.
7 **A. Okay. I don't have any information about**
8 **Officer Udero traumatizing Mr. Wheeler in any way.**
9 **The only thing I have available to me is the other**
10 **inmate beating the heck out of Mr. Wheeler. So I**
11 **don't know what the other expert is basing his opinion**
12 **on.**
13 MR. ORTIZ: Thank you.
14 MR. WALKER: Dr. Saris, you're done. I
15 mean, unless someone else wants to jump in real quick.
16 MR. PARK: Yeah, let's open it up, let
17 everyone -- I mean, well, the -- the guardian. Mike?
18 Kelly? Julio?
19 MR. ROMERO: No.
20 MR. PARK: You good?
21 MR. ROMERO: No questions on behalf of
22 Plaintiff Nikki --
23 MR. PARK: Okay. Thanks.
24 MR. ROMERO: -- Lawrie.
25 MR. PARK: Appreciate it.

---

Page 133

1 MR. ROMERO: Thank you.
2 MR. PARK: Thank you.
3 THE WITNESS: Is that everyone?
4 MR. PARK: Yeah. Thank you. The doctor
5 will read and sign. We appreciate it.
6 MR. WALKER: Okay.
7 THE VIDEOGRAPHER: This concludes the
8 deposition. We're off the record at 2:00 p.m.
9 (Deposition concluded at 2:00 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

D'ANTONIO vs. NM CORRECTIONS DEPT, et al.
No. 1:21-CV-01027-JB-GBW

Stephen C. Saris, M.D.
October 10, 2023

---

Page 134

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW MEXICO
2
3   MICHAEL D'ANTONIO, as the plenary conservator
    and next friend of TYLER WHEELER, and NIKKI
4   LAWRIE, as the guardian and next friend of A.W.,
    a minor;
5
         Plaintiffs,
6
    v.              No. 1:21-cv-01027-JB-GBW
7
    NEW MEXICO CORRECTIONS DEPARTMENT;
8   CENTENE CORPORATION; MHM HEALTH
    PROFESSIONS, LLC; CENTURION
9   CORRECTIONAL HEALTHCARE OF NEW MEXICO, LLC;
    DAVID UDERO; NATALIA HUDSON, R.N.;
10  SHERI PIERCE, H.S.A; and
    JOSE G. ANDRADE-BARRAZA, M.D.;
11
         Defendants.
12
13     CERTIFICATE OF COMPLETION OF DEPOSITION
14     I, MELISSA GOODSON, RPR, CCR #410, DO HEREBY
    CERTIFY that on October 10, 2023, the Video Deposition
15  of STEPHEN C. SARIS, M.D., was taken before me at the
    request of, and sealed original thereof noting by:
16
         FOR THE PLAINTIFF MICHAEL D'ANTONIO
17       SAMUEL H. WALKER, ESQ.
         ATKINS & WALKER LAW
18       127 Bryn Mawr Driver, Southeast
         Albuquerque, New Mexico  87106
19
20     I FURTHER CERTIFY that copies of this Certificate
    have been mailed or delivered to all Counsel and
21  parties to the proceedings not represented by counsel
    appearing at the taking of the Deposition.
22     I FURTHER CERTIFY that examination of this
    transcript and signature of the witness was REQUESTED
23  by the witness and all parties present.  On
    _____, a letter was mailed or delivered to
24  ALFRED A. PARK regarding obtaining signature of the
    witness, and corrections, if any, were appended to the
25  original copy of the Deposition.

---

Page 135

1      I FURTHER CERTIFY that the recoverable cost of the
    original and one copy of the Deposition, including
2   exhibits, to SAMUEL H. WALKER is $_____.
3      I FURTHER CERTIFY that I did administer the oath
    to the witness herein prior to the taking of this
4   Deposition; that I did thereafter report in
    stenographic shorthand the questions and answers set
5   forth herein, and the foregoing is a true and correct
    transcript of the proceeding had upon the taking of
6   this Deposition to the best of my ability.
7      I FURTHER CERTIFY that I am neither employed by,
    nor related to, nor contracted with (unless excepted
8   by the rules) any of the parties or attorneys in this
    case, and that I have no interest whatsoever in the
9   final disposition of this case in any court.
10
11
12
13
    MELISSA GOODSON, RPR
14  New Mexico CCR #410
    License Expires:  12/31/23
15
16
17
18
19
20
21
22
23
24
25

---

Page 136

1   D'ANTONIO, ET AL. v. NEW MEXICO CORRECTIONS
         DEPARTMENT, ET AL.
2
         DEPONENT SIGNATURE/CORRECTION PAGE
3
       If there are any typographical errors to your
4   deposition, indicate them below.
5   PAGE   LINE
6   _____Change to_____
7   _____Change to_____
8   _____Change to_____
9   _____Change to_____
10     Any other changes to your deposition are to be
    listed below with a statement as to the reason for
11  such change.
12  PAGE   LINE        CORRECTION     REASON FOR CHANGE
13  _____
14  _____
15  _____
16  _____
17  _____
18     I, Stephen C. Saris, M.D., do hereby certify that
    I have read the foregoing pages of my testimony as
19  transcribed, and the same is a true and correct
    transcript of the testimony given by me in this
20  Deposition on October 10, 2023, except for the changes
    made.
21
22
23
24
    _____         _____
25  Date Signed         STEPHEN C. SARIS

---