1

Tyler Wheeler vs. New Mexico Department of Corrections, et al.

United States District Court for the District of New Mexico

# Exhibit A

**EXHIBIT**

**1a**

Phil Stanley

Plaintiff Expert Report

July 28, 2022

INTRODUCTION

My experience in the field of corrections spans fifty years, starting in 1969. My current resume is attached as Exhibit A. I began my career by working with juveniles as a counselor at a juvenile correctional facility in Washington State for three years. Thereafter, I have worked with adult offenders at every stage of the criminal justice system, including probation, parole, work release, prisons and jails. My thirty year career with the Washington Department of Corrections included work at all levels of the organization, with progressively more responsibility at each level. I was Superintendent (Warden) of three prisons, including the primary prison for mentally ill inmates (Special Offender Center). The final three years of my Washington State career was as Regional Administrator, with overall responsibility for three prisons, including approximately one-third of the prison population of Washington State.

After retirement from Washington Department of Corrections in 2000, I was appointed as Commissioner of the New Hampshire Department of Corrections and served two

governors over four years, responsible for leadership of all prisons and parole programs. During this time the New Hampshire Department of Corrections prisons and parole operations, including programs for the mentally ill, was fully accredited by the American Correctional Association. The accreditation process requires a jail or prison to follow national standards of care and custody for inmates.

From 2007 to 2012 I was the Director of the Chelan County Regional Justice Center, the primary jail (380 beds) for Chelan and Douglas Counties in central Washington State. While the Director, I participated in the revision of Jail Guidelines for Washington State jails, for the Washington Association of Sheriffs and Police Chiefs. These jail guidelines have since become the standards for jails in Washington State. During that time I was also a board member of the Regional Support Network (Mental Health) for that area of Washington State.

For the last six years I have consulted as a jail expert related to court cases, for both plaintiff and defense, in Washington State, California, New Mexico, Mississippi, Wisconsin, Oregon, Iowa and Illinois. In 2015, I was appointed federal monitor of a Settlement Agreement, regarding jail conditions, in Farris, et al. v. Franklin County, U.S. District Court, Eastern District of Washington, reporting to a Federal District Court Judge. In December 2018 I began work as a federal monitor in Disability Rights Washington v. Yakima County, U.S. District Court, Eastern District of Washington, a case involving provision of services for mentally ill in the Yakima County jail.  I have also provided analysis and recommendations to two Sheriffs and a Police Chief on their operation of jails, including the care of mentally ill inmates, inmates in alcohol withdrawal and inmates who indicate a risk for suicide.

3

Exhibit B contains a list of cases in which I have testified in the past six years and Exhibit C identifies my compensation fees for expert work.


MATERIALS RELIED UPON


In order to provide analysis and opinion in the case of Tyler Wheeler I have reviewed a wide variety of materials provided by plaintiff's attorneys. The primary documents I have reviewed include:  Incident Report of David Udero; Incident report of patrolman Rodriguez; Supplemental Report #2 of agent Mora; Video recordings of incident on November 10, 2018; Recordings of interviews with Baltazar, Guzman, Flores, Araiza, Dominguez, Ruiz; Written statements of Udero, Flores, Ruiz, Araiza; Depositions of Araiza, Guzman, Udero, Hudson, Andrade, and Ramirez; Incident Command Curriculum for New Mexico Department of Corrections; Use of Force policy for New Mexico Department of Corrections; Correctional Officer Use of Force training for New Mexico Training Academy; Transfer of Inmates with Acute Medical Psychiatric Illness policy New Mexico Department of Corrections; Medical records related to Tyler Wheeler on November 10, 2018; Audio Statements of Udero, Flores, Ruiz and Araiza to OPS Investigators.

I have also reviewed the American Correctional Association, Standards for Adult Correctional Institutions, 4th Edition and the National Commission on Correctional Health Care Jail Health Standards (2014).

OVERVIEW

On November 10, 2018, at 7:45 p.m., an incident occurred on Housing Unit B of the Southern New Mexico Correctional Facility in Las Cruces, New Mexico. This incident involved an assault by inmate Luis Baltazar on inmate Tyler Wheeler. Based on viewing video recordings of the incident it is clear that inmate Baltazar was the aggressor, inviting inmate Wheeler into the shower area and then assaulting inmate Wheeler, who tries to escape from the shower area as inmate Baltazar continues to strike him. The video shows that the assault continues into the hallway in front of the control room. The video also shows that corrections officers arrived and the two inmates were separated. Among these officers was Lieutenant Udero, Sergeant Araiza, Sergeant Flores, Officer Guzman, Officer Dominguez and Officer Ruiz.

The video of the aftermath of the assault shows Tyler Wheeler laying on the floor with his shirt pulled around his head. The video shows that when the officers arrive, one of the officers, Lieutenant Udero, uses his foot to turn Mr. Wheeler onto his stomach, then the video shows Lieutenant Udero with his foot on the back of Tyler Wheeler. Then, the video shows a door being shut which obscures full view of the next few seconds, but it does show Lieutenant Udero reaching down toward Mr. Wheeler, there is some type of movement, which shows Mr. Wheeler's feet leave the ground, and then the video stops. Lieutenant Udero further testified that he entered the hallway and saw Tyler Wheeler on his stomach with his shirt over his head and he was bleeding everywhere.

Sergeant Araiza reports seeing Lieutenant Udero use force to handcuff Mr. Wheeler, who was not being aggressive. Sergeant Araiza describes that Lieutenant Udero had his knee on Mr. Wheeler's back and at the same time was commanding Mr. Wheeler provide his hands for cuffing. Mr. Wheeler was unable to comply with the Lieutenant's knee on his back. Sergeant Araiza states Lieutenant Udero then lifted Mr. Wheeler, shaking Mr. Wheeler, and his head hit the concrete floor. Lieutenant Udero lifted Mr. Wheeler a second time, shaking Mr. Wheeler, and his head hit the floor again. Sergeat Araiza described a lot of blood coming from Mr. Wheeler's ear. Sergeant Araiza described the shaking to the Office of Professional Standards as "violent" shaking. Sergeant Araiza stated that the violent shaking caused Mr. Wheeler's head to hit the floor twice near the upper left forehead, along the hairline. Sergeant Araiza described the impact as "pretty hard." When the Office of Professional Standards asked Sergeant Araiza whether he believed Lieutenant Udero's force was excessive, Sergeant Araiza said "yes."

Mr. Wheeler was taken to the medical area and was examined by Nurse Hudson. She examined him and cleared him to be sent to segregation, which is in another unit that required Mr. Wheeler to be transported by van. Before Mr. Wheeler was taken to the segregation unit, he was retained in the library under the observation of Officer Guzman. In the library, Officer Guzman testified that he witnessed further deterioration of Mr. Wheeler, including that Mr. Wheeler complaining of nausea, pressure in his head and dizziness. Officer Guzman further testified, among other issues, that Tyler Wheeler was requesting medical, becoming less alert, and was having difficulty sitting up on his own. Officer Guzman requested medical. A person from medical came to see Mr.

Wheeler. After Mr. Wheeler was evaluated by a person from medical, Nurse Hudson called Dr. Andrade. The decision was made to continue to monitor Mr. Wheeler and send him to the segregation unit. At some point, Mr. Wheeler was unable to walk independently, and a wheelchair was brought to him from medical.

Lieutenant Udero was aware of his worsening medical condition. He observed Mr. Wheeler after the trauma to his head. Lieutenant Udero knew Mr. Wheeler fell to the floor in the library. He witnessed Mr. Wheeler in the wheelchair. He asked Mr. Wheeler to sign a form to acknowledge transport to segregation. Mr. Wheeler was unable to sign the form, which Lieutenant Udero documented. Officers transported Mr. Wheeler to segregation where he was seen by Nurse Ramirez. Nurse Ramirez examined Mr. Wheeler who was now unconscious and limp. She called Dr. Andrade. Dr. Andrade ordered her to request an ambulance. Nurse Ramirez directed correctional staff to call for an ambulance. Correctional staff reported only that Mr. Wheeler needed a concussion assessment. Correctional staff did not report that Mr. Wheeler was unconscious or other wise suspected of having a brain injury.

After the assault and unauthorized use of force, correctional staff and medical providers unreasonably delayed requesting transport of Mr. Wheeler to an outside hospital. Mr. Wheeler suffered a head trauma at 7:45 p.m. He was brought to medical at 8:00 p.m. He had progressively worse signs of a medical emergency from 8:00 p.m. until 9:54 p.m., when correctional staff called dispatch and finally requested an ambulance. The ambulance departed the prison at 10:42 p.m. for transport to Mountain View Hospital. This time period represents three hours of lost time in providing outside medical aid to Tyler Wheeler.

EXCESSIVE USE OF FORCE CAUSING SEVERE HEAD INJURY


The New Mexico Department of Corrections Use of Force policy (CD-130600) defines Excessive Force as " A type or amount of force beyond that which is reasonably necessary to control the situation and achieve the correctional objectives; or the continued use of force after it is no longer necessary." This concern with excessive force is also described in the American Correctional Association, Standards for Adult Correctional Institutions, 4th Edition, regarding Use of Force (4-4206) which states "The use of physical force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with the appropriate statutory authority. In no event is physical force used as punishment." It is my opinion that both this standard and New Mexico DOC policy were violated by Lieutenant Udero in his use of force on Tyler Wheeler. In none of the testimony in depositions or recorded interviews of corrections staff was there any description of Tyler Wheeler being physically aggressive. Lieutenant Udero never said in his statements that he had to defend himself against Mr. Wheeler. Lieutenant Wheeler never said that Tyler Wheeler was endangering others, or property, or was trying to escape. Yet, excessive force was applied to Mr. Wheeler.

The video of the incident with inmate Baltazar shows clearly that Mr. Wheeler was not the aggressor and when officers arrived, Mr. Wheeler was laying on the ground, not moving, with his shirt pulled around his head. The actions of Lieutenant Udero to put his

foot on Mr. Wheeler to turn him onto his stomach is not an an action that is acceptable under any correctional standard of which I am aware. Then, Lieutenant Udero continued to keep his foot on Mr. Wheeler's back and it is clear from the video that Mr. Wheeler is not moving, and is certainly not being aggressive in any manner. Mr. Wheeler was the victim of an assault by another inmate. The placing of his foot on the back of Mr. Wheeler is a callous move, not taught in any use of force training with which I am familiar. The video footage continues and is then blocked from full view when a door is closed, obscuring Mr. Wheeler, who is on the ground. At this point in the video, there appears to be a motion by Lieutenant Udero towards Mr. Wheeler on the ground, and Mr. Wheeler's feet can be seen leaving the ground, then the video ends. Sergeant Araiza, in his recorded interview following the incident says that he observed Lieutenant Udero ordering Mr. Wheeler to give him his hand for handcuffing. Sergeant Araiza heard Mr. Wheeler say "I can't, you're on my arm." Later in the interview, Sergeant Araiza describes what he termed "excessive force." When Mr. Wheeler was slow to respond in providing his hand for cuffing, Sergeant Araiza said that Lieutenant Udero shook Mr. Wheeler twice, and Mr. Wheeler's head hit the concrete floor both times. Sergeant Araiza said Lieutenant Udero "had him by the shoulders, shaking him and pulling up and down. I did observe his head hit the floor." Sergeant Araiza went on to describe that he saw a lot of blood "from his ear." Sergeant Araiza's written statement says "I then observed Lieutenant Udero again give inmate Wheeler the directive to give up his hand lifting both shoulders and shaking him resulting in inmate Wheelers head hitting the floor." Then Sergeant Araiza states "I observed Lieutenant Udero again issuing the command to inmate Wheeler to give up his hand, pulling inmate Wheeler by the

shoulders shaking him resulting in inmate Wheelers head hitting the floor a second time." (NMCD 1907) Sergeant Araiza said that "our policy describes that we are to command that hands are to be freed for cuffing, not to use excessive force to get compliance."

The New Mexico Department of Corrections Policy on Use of Force (CD-130601) goes into further detail regarding the limitations of the use of physical force. This policy delineates seven instances where force may be used (NMCD 01330, NMCD 01331) and none of these instances even remotely authorize the situation where Lieutenant Udero shakes Mr. Wheeler, hitting his head on a concrete floor. This policy clearly states that "Prior to use of force, non-force alternatives such as verbally resolving situations will be considered to the extent that time and circumstances reasonably permit."(NMCD 01331) The assault of Tyler Wheeler was already over when Lieutenant Udero entered to hallway. There was no emergency, urgency or time issue that required immediate action. Mr. Wheeler was responding to Lieutenant Udero, asking him to get his knee off his arm so he could be handcuffed. But, Lieutenant Udero was apparently impatient with the effort of Mr. Wheeler to bring his hand out from under Lieutenant Udero's knee, and shook Mr.Wheeler, hitting his head on the ground, twice, in violation of New Mexico DOC policy, in my opinion.


DELAY IN PROVIDING HOSPITALIZATION AFTER EXCESSIVE USE OF FORCE


The National Commission on Correctional Health Care Standards for Health Services in Jails has a standard for Emergency Services (J-E-08) that describes "The

facility provides 24-hour emergency medical, dental, and mental health services." The compliance indicators for this standard includes "Emergency transport of the patient from the facility; Use of an emergency medical vehicle; Use of one or more designated hospital emergency departments or other appropriate facilities; Emergency on-call physician, dental, and mental health services when the emergency health care facility is not nearby." This standard further specifies that "This standard intends that sufficient emergency health planning occurs and is put into effect when necessary. Planning ahead for emergencies can help minimize bad outcomes." It is my opinion that the decision to wait more than two hours to summon an ambulance for Tyler Wheeler is an instance of extremely poor communication between medical staff and corrections staff. Although I am not a medical professional, my training in corrections is sufficient to know that head injuries require swift response to prevent long term effects. As an administrator of prisons and jails, the overriding principle that I instructed my medical and corrections staff to practice was that if a situation was readily apparent that an inmate was injured severely, they should be taken to an outside hospital immediately for treatment. Whether a nurse, doctor, or corrections shift supervisor makes the call for an ambulance or EMT, is not important as long as medical aid in the form of emergency transport occurs as rapidly as possible.

It is my opinion, from review of the materials, that Tyler Wheeler was obviously severely injured by blows to his head. Multiple staff described that Mr. Wheeler had much bleeding, dizziness, nausea, and difficulty in speaking in the more than two hours that passed before an ambulance was summoned. Lieutenant Udero described Mr. Wheeler as needing "to be cleaned up by medical staff due to having blood all over his

face." (Incident report, November 10, 2018, Lieutenant Udero) Sergeant Araiza said "He had a lot of bleeding from his ear." (November 28, 2018 recorded statement) Sergeant Flores said Mr. Wheeler was "disoriented."(Recorded statement December 6, 2018) Before he was transported Mr. Wheeler was described as also vomiting. Officer Dominguez described that while he was sitting with Mr. Wheeler after the incident that he was "Nauseous" and complained about pressure in his head. (Recorded statement, December 6, 2018) All of this information was sufficient for corrections staff to summon an ambulance for Mr. Wheeler, with or without the review by medical staff. Ultimately, this was the action that should have occurred, almost immediately, by Lieutenant Udero, as the Warden's designee.

When Mr. Wheeler was taken to the prison medical office at 8 p.m., after the incident, and he was seen by Nurse Hudson. In Nurse Hudson's deposition she says she examined him and "Cleared inmate. Prepared chart for Seg transfer." (p.101) Nurse Hudson also states that she did not do a neuro check or a PERLLA check.(pp.102-103) At 8:50 p.m. Nurse Hudson again saw Mr. Wheeler because he was complaining of "dizziness and nausea" (p. 107) When asked why she didn't call 911 for an ambulance Nurse Hudson said "Cause I needed to get the approval of the doctor."(p. 127) Nurse Hudson's deposition describes a dispute whether she told Dr. Andrade (who was not onsite) about Mr. Wheeler being dizzy. (p. 128) But, Dr. Andrade did not authorize a transport to an outside hospital, until much later after receiving a call from Nurse Ramirez.  Nurse Hudson also was asked whether she should have called 911 on her own and she said "Not other than that they get mad at us if we send them without their approval." When asked why "they get mad" she replied "Moneywise, I guess. I don't

know." (p. 151) Nurse Hudson was again asked whether there was a medical reason to not send Tyler Wheeler to the hospital and she replied "No. I should have." (p. 152) This information regarding the diagnosis of Mr. Wheeler's head injury and the long delay in transporting him to a hospital speaks not only to dysfunction within the medical department of the Southern New Mexico Corrections Facility, but also indicates a clear focus on saving money rather than preserving an inmate's health. This orientation is dictated by the prison administration, just as much as from the medical department, in my opinion.

A further barrier to providing for Mr. Wheeler being taken to an outside hospital was the process requiring not only a doctor's approval, but then a requirement that medical staff do not summon the ambulance because that requires corrections officers to make that call. Nurse Ramirez, who was in the prison infirmary, where Mr. Wheeler was transported, after his encounters with Nurse Hudson, said in her deposition "The policy is that officers call, custody calls for the ambulance." (p. 50) This process of approval by a doctor to authorize an ambulance, and then the call for the ambulance being required to be done by custody staff represents needless delay causing a significantly dysfunctional system to work through to get an inmate emergency medical help, when needed.

The New Mexico Department of Corrections policy on Transfer of Inmates with Acute Medical or Psychiatric Illness (CD-173100) states "Inmates who need health care beyond the resources available at the facility, as determined by the responsible health care practitioner, shall be transferred under appropriate security provisions to a facility where such care is available." Another NMDOC policy on Transfer of Inmates with Acute

Medical Illness (CD-173101) states "All requests by the health care authority for emergency transports shall be authorized by the Warden or a designee who is responsible for providing the necessary transport security in a timely manner." It is my opinion that the communication between medical staff and custody staff at the Southern New Mexico Correctional Facility was seriously flawed, resulting in a substantial delay in providing emergency transport of Tyler Wheeler to an outside hospital. Lieutenant Udero was the "designee" of the Warden and, knowing all that he knew about the circumstances of Tyler Wheeler's injury, should have acted more promptly to coordinate with medical for an ambulance to transport Mr. Wheeler. Ultimately the break down in providing emergency medical aid to Tyler Wheeler rests with the inaction of Lieutenant Udero, dysfunction within the prison medical department, and the failed policies of the administration of the Southern New Mexico Correctional Facility.

CONCLUSION

On November 10, 2018 Lieutenant Udero engaged in unauthorized use of force to get Mr. Wheeler handcuffed after Mr. Wheeler was assaulted by another inmate. Mr. Wheeler was never aggressive towards other inmates or corrections staff on this date. The injuries sustained by Tyler Wheeler were not treated in a timely manner. The delay in summoning emergency transport for Mr. Wheeler to an outside hospital for treatment of obvious head injuries was unconscionable. The dysfunction demonstrated by the three hour delay in the ambulance leaving the Southern New Mexico Correctional Facility reveals to me that financial concerns outweighed inmate health concerns

The final result, that Mr. Wheeler continues to have serious health concerns to this day, is the responsibility of the New Mexico Department of Corrections and its health care provider, in my opinion.

Date____ July 27, 2022 _____

Signature_____

Printed
Name_____ Philip Stanley _____