Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL D'ANTONIO, as the plenary conservator
and next friend of TYLER WHEELER, and NIKKI
LAWRIE, as the guardian and next friend of A.W.,
a minor,

        Plaintiffs,

vs.               No. 1:21-cv-01027-JB-GBW

NEW MEXICO CORRECTIONS DEPARTMENT,
CENTENE CORPORATION, MHM HEALTH
PROFESSIONALS, LLC, CENTURION
CORRECTIONAL HEALTHCARE OF NEW MEXICO, LLC,
DAVID UDERO, "JANE" HUDSON, R.N., and
JOSE G. ANDRADE-BARRAZA, M.D.,

        Defendants.

DEPOSITION OF PHILIP STANLEY VIA ZOOM
December 12, 2023
11:01 a.m.
Albuquerque, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  MR. TONY F. ORTIZ
    ATTORNEY FOR THE DEFENDANTS NEW MEXICO
    CORRECTIONS DEPARTMENT AND DAVID UDERO

REPORTED BY:  DENISE KOPAN, CCR #124
    TRATTEL COURT REPORTING & VIDEOGRAPHY
    609 Twelfth Street, Northwest
    Albuquerque, New Mexico 87102

89b3e8af-4dbb-4a0e-8eec-f8d055cfea46

Michael D'Antonio, et al. v. New Mexico Corrections Department, et al.
Philip Stanley

December 12, 2023
No. 1:21-cv-01027-JB-GBW

Page 158

have related to your background.

You're not a medical professional, correct?

A. I am not.

Q. You have not graduated from medical school?

A. No.

Q. Have you attended medical school?

A. No.

Q. Have you graduated from nursing school?

A. No.

Q. Have you attended any nursing classes?

A. No.

Q. Have you attended any classes about providing medical care to individuals?

A. Standard classes in the correctional field is CPR training, and I attended that on a yearly basis.

Q. Okay. Other than CPR training, have you attended any classes on providing medical care to individuals?

A. Not classes, no.

Q. When you say "not classes," have you attended anything related to providing you training or education for the provision of medical services to individuals?

A. Yes. I have participated in training at the National Correctional -- National Institute of Corrections with regard to prison administration and

Page 159

jail administration at different points in my career, and part of that was always having to deal with medical issues, what were the current medical issues in the field of corrections, how do you handle various issues, et cetera et cetera, but as far as the practice of, you know, medicine, they did not cover that.

Q. Okay. You have never worked in the medical profession, have you?

A. No.

Q. Have you, yourself, ever provided medical care to anyone?

A. No. I did provide CPR a long time ago to an inmate.

Q. Have you ever -- oh, go ahead.

MR. WALKER: I'm sorry. I don't -- maybe I misread our report. I don't think we are offering him as an expert on medicine.

MS. LUERAS: All right. Is that an objection to form?

MR. WALKER: No. It's just --

MS. LUERAS: He has medical opinions. So I do get to ask him about his medical background.

MR. WALKER: I don't think -- okay. Maybe I just don't understand, Taylor. I don't think we have offered him to give medical opinions.

Page 160

MS. LUERAS: I mean, there is an opinion about the delay of providing consultation after excessive use of force. He goes through her nursing notes and what she did and didn't do. I get to ask background.

MR. WALKER: That's fair. I guess in my mind, I saw it more as an administration thing, and if you are right, I'm sorry. Please continue.

Q. (By Ms. Lueras) In your various jobs, have you ever overseen the provision of medical care to patients?

A. No. I have seen -- I have been in the medical areas when inmates have received medical treatment.

Q. But you have not overseen it, like supervised it?

A. Well, yes, in the sense that I -- as a prison warden, I made the personnel decisions about who was going to be on staff and approved their hirings. In, for instance, the jail that I ran, I hired or disciplined the medical staff in whatever situation occurred. So I had oversight and management responsibilities with regard to that.

Q. Okay. Have you ever provided opinions in court regarding medical care, medical standards?

Page 161

A. I provided opinions with regard to the -- to how medical staff operate within a correctional setting.

Q. Okay. Was that in court?

A. What's that?

Q. Was that in court?

A. Not -- I have only been in court once or -- no, court twice, and I don't think either of those cases -- I mean, I have provided expert testimony in depositions in cases regarding medical, but I don't think any have ever been in actual court on a medical issue.

Q. Okay. You testified earlier that you are not going to provide any medical opinions in this case; is that correct?

A. Yeah. My opinions in the medical area have to do with how staff did or did not carry out the responsibilities, as I saw it, with regard to treatment of Mr. Wheeler, but not with regard to their medical expertise.

Q. What do you mean, "with regard to treatment of Mr. Wheeler," his medical treatment?

A. Well, his -- the way he was handled following his assault and the delay in getting him to an outside hospital.

41 (Pages 158 to 161)

89b3e8af-4dbb-4a0e-8eec-f8d055cfea46

Michael D'Antonio, et al. v. New Mexico Corrections Department, et al.
Philip Stanley

December 12, 2023
No. 1:21-cv-01027-JB-GBW

Page 174

saying is that it's from a correctional standpoint.  I am trying to understand what that opinion is and what it's based on.

A.  He goes from -- you know, obviously, he is bleeding.  You know, initially, 8:00, when he first shows up, he is bleeding; he has got wounds to his head, and then almost an hour later, he has got dizziness and nausea.  So it seems like there is a progression occurring here.  So my view as a layperson is that his condition is getting worse.

Q.  Okay.  And I am wondering how that relates to the correctional standpoint that you referred to, because all I heard was "medical."

How does that relate to corrections, corrections policy?

A.  It relates to corrections, again, back to my point earlier, is that the officers who had Mr. Wheeler in custody could have said, "Hey, this guy is wounded, bleeding, now he is dizzy and nauseous.  Let's get him to an outside hospital."  So they could have made the call, too.

Q.  And when you say "they," you mean, corrections staff?

A.  Corrections staff, yeah.  Yeah.

Q.  Is there any other part of that opinion that

Page 175

we are talking about now, which is, what else should have been done by Nurse Hudson, anything else related to corrections, the correctional standpoint that you referred to?

A.  Well, I think I have described what -- I mean, she did what she thought she needed to do, and the way things operated was she needed to get the approval of the doctor.  So she did what she needed to do in that regard.

And -- so I -- again, I would, in managing medical staff, as well as correctional staff, I would reiterate that anybody can make -- should be able to make that call, to that decision to take to an outside hospital.  It shouldn't have -- my opinion is that the step of requiring Dr. Andrade's authorization was a, you know, unnecessary step.

Q.  Can you tell me more about that?

A.  Well, the doctor is not on-site.  I mean, if the doctor is on-site, then, okay, the doctor should be part of that decision-making, but the doctor is not on-site; the nurse is on-site; the custody officer is on site; Mr. Wheeler is on-site.

All the people who are part of the decisions to be made to take to an outside hospital are on-site.  Dr. Andrade is not there.  And she speaks to that down

Page 176

below when she says about the money.  Well, this should not be a money issue.  That's totally wrong-headed.  So if that step was in place to manage finances, then they have made a huge mistake organizationally and treatment-wise, in my opinion.

Q.  Okay.  Yeah.  That was my next -- the next thing I was going to ask you about, was this next opinion that I saw on page 12, that "This information regarding the diagnosis of Mr. Wheeler's head injury and the long delay of transporting him to a hospital speaks not only to the dysfunction within the medical department of the Southern New Mexico Corrections Facility, but also indicates a clear focus on saving money rather than preserving an inmate's health."

Is that an expert opinion that you plan on testifying to in court in this case?

A.  I do.

Q.  Tell me who diagnosed that Mr. Wheeler had a head injury and when.  I am curious about that part.

A.  Well, the diagnosis is part of what was occurring with medical and then the consultation with the doctor.

Q.  And then tell me about this, "the long delay in transporting him to a hospital," what's that "long delay" that you are referring to?

Page 177

A.  Well, it was at least a couple hours, and I think maybe -- I don't have the exact time frame, probably should have put that in my report, but it took awhile to get around to saying -- you know, for someone to make the decision finally, "Yeah, let's take him out to an outside hospital."  And if that decision is primarily about saving money, as opposed to preserving an inmate's health, then I have a huge concern over that.

Q.  Okay.  What is that part of your opinion based on that indicates "a clear focus on saving money rather than preserving an inmate's health"?

What is that part of your opinion based on?

A.  Well, it's based upon the comment that Nurse Hudson said up above, where money -- "They get mad.  Moneywise, I guess, I don't know."  I mean, she obviously had a concern that, you know, she couldn't make that decision because it was potentially going to cost some money.

Q.  Okay.  And she said, "Moneywise, I guess, I don't know."

Is there any other evidence that you base this opinion on, this portion that says, "also indicates a clear focus on saving money rather than preserving an inmate's health"?

45 (Pages 174 to 177)

89b3e8af-4dbb-4a0e-8eec-f8d055cfea46

Michael D'Antonio, et al. v. New Mexico Corrections Department, et al.
Philip Stanley

December 12, 2023
No. 1:21-cv-01027-JB-GBW

Page 178

A. Well, yes, and I think it's referenced down below, where then the doctor gets involved and finally says, "Okay. Well, let's get him to an outside hospital," then takes the custody officers to call the ambulance. I believe that's Nurse Hudson's reference, that the policy is the officers call, as opposed to the medical staff.

Q. Okay.

A. So you have got kind of, in my opinion, a convoluted process involving -- it should be an streamline of decision, movement, decision, movement, and that's not the way this was structured at this facility.

Q. Can you explain to me what you mean by "decision, movement"?

A. Decision to take someone to an outside hospital and then you get him moved. You either transport them yourselves, which can be done, or you call the ambulance in.

Q. In your experience, is it unusual for medical staff and security to coordinate for transporting an inmate off-site for medical care?

A. Could you ask that question again?

Q. Yeah. In your experience, is it unusual for medical staff and security staff to coordinate the

Page 179

transfer of an inmate for outside medical care?

A. No, it's not unusual at all. It should be one of the, I guess, underlying principles, is that medical staff and corrections staff are working together, but having said that, the bottom line for an inmate's life rests with the jail's administration and the prison's administration.

So I have seen instances where medical staff will say, "Oh, it doesn't need to go to an outside hospital. We don't need to call the ambulance," and custody staff have called -- made that call, and that's the right call to make, because custody -- at the bottom -- at the end of the day, it's custody staff and prison administration or jail administration that's responsible for that inmate's life.

Q. Okay. So here -- and this is on page 12 of your report, this middle paragraph, where you say, "This process of approval by a doctor to authorize an ambulance and then the call for the ambulance being required to be done by custody staff represents needless delay, causing a significantly dysfunctional system to work through to get an inmate emergency medical help when needed."

What is the -- did you form an opinion as to what the "needless delay" was, as you state here in

Page 180

this case?

A. I just think that the steps of calling the doctor and to call the doctor a couple times, the doctor is not on-site. So there is some delay there. There is a delay between the doctor's approval and then, "Okay. Now we have got to contact custody and have them make the call for the ambulance." So all of that is a part of that, what I call the "needless delay."

Q. Do you have an opinion, within a reasonable degree of medical certainty, as to how that delay that you reference caused harm to Mr. Wheeler?

A. No.

Q. Moving on to page 13 of your report, and I'm going to go down to the "Conclusion" section, in this sentence that says, "The delay in summoning emergency transport for Mr. Wheeler to an outside hospital for treatment of obvious head injuries was unconscionable."

Can you tell me what you mean by that?

A. Well, if Nurse Hudson's assessment was correct, that it was all about money, then the delay here was unconscionable. So whether it was a money decision to delay moving him, getting him out to a hospital, or whether it was communication issues between officers and medical, or, you know, whatever

Page 181

that -- whatever caused the delay was unconscionable.

Q. Is this an opinion, that within a reasonable degree of medical certainty that the medical provider, such as Nurse Hudson, fell below the standard of care?

A. That's not a medical opinion.

Q. What standards do you base this opinion on?

A. I don't know that there is a -- I mean, there are standards -- there are standards with regard to moving inmates to outside hospitals when circumstances dictate.

Q. Are those the NCCHC standards?

A. Yeah, there are some NCCHC standards with regard to that. I did not include those standards in my report, probably could have and should have, but I think if I looked into those standards, I would find -- you would find something related to that.

MS. KOPAN: Could I have that acronym again, please?

MS. LUERAS: Yes. NCCHC.

MS. KOPAN: Thank you.

Q. (By Ms. Lueras) Do you have an opinion that the NCCHC standards constitute the standard of care for medical providers in a prison setting?

A. I think that they do. There are standards that jails and prisons are held to and there are

46 (Pages 178 to 181)

89b3e8af-4dbb-4a0e-8eec-f8d055cfea46

Michael D'Antonio, et al. v. New Mexico Corrections Department, et al.
Philip Stanley

December 12, 2023
No. 1:21-cv-01027-JB-GBW

Page 190

in effect when you were the prison superintendent and Director of the jails, correct?

A. When I was a Jail Director, yes.

Q. You were a Jail Director. That's right. Okay. And then these standards remained in place, or this Fourth Edition remained in place all the way until 2020, when the Fifth Edition came out?

A. Yes.

Q. Okay. While we are on the topic of qualifications I think there is just a -- maybe on my part -- regarding your expertise in terms of jail administration and health care.

Kind of just describe what you see your role and your knowledge as in terms of jail -- or prison administration and health care.

A. Well, as a jail administrator or prison administrator, you are responsible for either the direct hiring of medical staff and the oversight of medical, or in a contract situation, you are -- the contract agency would be responsible for the hiring, but you still have authority over the medical contract.

So it's akin, in my opinion, to it's a department. You are prison superintendent or Jail Director, and it's -- there is different -- different

Page 191

functions or different departments, and that's just one of the departments that you oversee, and, you know, you are in discussion -- as a warden or a Director, you are in discussion with medical staff over a variety of issues in terms of how health care is provided.

Q. Is it fair to say, though, that jail administrators don't make health care decisions as in they are not making medical diagnoses?

A. No, they don't, and, you know, they -- the medical -- that's why you hire the medical staff. That's why you contract for medical staff, so they make the medical decisions.

Q. And once it's determined that an inmate has a medical emergency, then what is the jail's or the prison's responsibility?

MR. ORTIZ: Object to form. Foundation.

THE WITNESS: The responsibility is to get that inmate the best care possible either by bringing in additional prison medical staff or transporting that inmate to an outside hospital.

It's a responsibility of the administrator, warden, or Director to make sure that that process happens as seamlessly as possible as quickly as possible, because you are dealing very often with life-or-death matters.

Page 192

Q. (By Mr. Walker) When you were superintendent of the prison, did you have to coordinate getting inmates transported to hospitals?

A. Personally, no.

Q. Did you oversee staff who were responsible for transporting -- making sure inmates got to the hospital?

A. Yes.

Q. And when you were prison superintendent, what was the policy for getting inmates to a hospital?

A. Well, the process, as I referenced earlier, could take -- the process for getting someone to an outside hospital can happen basically two ways: Either you bring in -- you bring in an ambulance and have the inmate transported via ambulance to the outside hospital. In that case, you have got EMT on the ambulance; the inmate is getting EMT care directly from the prison to the outside hospital.

The other scenario is that your prison staff, themselves, transport to the hospital. The prison staff transporting to the hospital is most typically when kind of what I refer to as -- usually, it's a non-emergency situation where an inmate needs to go to an outside hospital to get a certain type of x-ray or a certain type of treatment or something like that. And

Page 193

the swiftness of medical care is not -- at that moment is not the central issue, but it can happen, basically, in those two ways.

Q. In terms of the jail contacting you, would the jail be responsible for overseeing medical?

MR. ORTIZ: Objection to form.

THE WITNESS: Yes. Yes, I hire --

MR. ORTIZ: And foundation.

THE WITNESS: Excuse me.

MR. ORTIZ: Sorry. I said, "Foundation." I apologize.

THE WITNESS: I hired -- at the jail that I was Director of, I hired the medical staff and did evaluations, and, in a few cases, did discipline.

Q. (By Mr. Walker) Were you responsible for ensuring there were policies and procedures for how an inmate gets transported to a hospital?

A. Yes.

Q. And since you left working at the jail, you have continued to keep abreast of standards regarding when -- from a jail administration point of view -- when to transport an inmate to a hospital, correct?

MR. ORTIZ: Objection. Form and foundation.

THE WITNESS: Yes. As indicated earlier, there is some NCCHC, National Commission on

49 (Pages 190 to 193)

89b3e8af-4dbb-4a0e-8eec-f8d055cfea46

Michael D'Antonio, et al. v. New Mexico Corrections Department, et al.                    December 12, 2023
Philip Stanley                                                                              No. 1:21-cv-01027-JB-GBW

Page 194

Correctional Health Care, standards related to that issue.

MR. WALKER: Okay. And, Madam Court Reporter, could you remind me what exhibit his report is?

MS. KOPAN: Exhibit 4.

Q. (By Mr. Walker) I'm going to show you your report, Mr. Stanley, on my computer here. Just a second. All right. Let me know when you can see it.

A. Okay.

Q. Because I think there was some confusion. You said you didn't set standards in your report, but I'm going to direct you to pages nine and ten here in your report.

Can you see it?

A. Yes, I see that.

Q. Can you see the standard that I put before you that's in your report?

A. Yes, I see that.

Q. Is that the standard that you were referring to before?

A. Yes. I -- well, no. That is an NCCHC standard. I think what I was referring to earlier was that I think there is another standard related to emergency transport and transport to outside

Page 195

hospitals.

So I don't have those standards in front of me, but I think there is either another standard or part of another standard that references that decision-making process, and I didn't include that in my report.

Q. All right. I want to talk a little bit more about some of these use-of-force opinions. You were asked questions about -- based on policy -- about whether it's permissible to use force when there is a -- there are other inmates around.

Do you remember that line of questioning?

A. Yes.

MR. ORTIZ: Objection to form.

Q. (By Mr. Walker) What is the justification for hitting an inmate's head on the floor just because there is other inmates around?

What would be the reason for doing that?

MR. ORTIZ: Objection. Form and foundation.

THE WITNESS: There is no justification for that.

Q. (By Mr. Walker) And what would be the justification for hitting an inmate's head on the floor because they are injured?

MR. ORTIZ: Objection. Form and foundation.

Page 196

THE WITNESS: There is no justification for that.

Q. (By Mr. Walker) And what is the justification for hitting an inmate's head on the floor because there was a fight beforehand?

MR. ORTIZ: Objection. Form. Foundation.

THE WITNESS: No justification.

Q. (By Mr. Walker) When an officer makes a use-of-force decision, should they be making the decision based on what's happened in the past or what's happening right at that moment?

MR. ORTIZ: Objection to form.

THE WITNESS: They need to assess the situation that's in front of them and take appropriate action. They don't necessarily have all the details of what's transpired before the situation in front of them. So they arrive at a scene and they may or may not know what came before.

Q. (By Mr. Walker) I'm going to throw you a hypothetical. If an inmate was resisting, but then stopped and is complying, can that officer now use force?

A. Should not. You know, use of force is basically justified when there is resistance or problematic behaviors that they need to get control of.

Page 197

Q. Once that resistance is gone, though, once that justification is gone, can the officers then go ahead and use force?

MR. ORTIZ: Objection. Form.

THE WITNESS: Well, once the resistance is -- if there is an inmate who is in compliance, then if, by "force," you mean, can you put handcuffs on, yeah, you can put handcuffs on, and that's considered a part of the use-of-force continuation.

Q. (By Mr. Walker) Mr. Stanley, we are talking about the shaking of an inmate and hitting his head on the floor. I am not trying to talk about the whole world of --

MR. ORTIZ: Objection to form.

THE WITNESS: I understand. Then no, there is no justification when someone is being compliant.

MR. WALKER: I'm going to mark this as Exhibit 13.

Q. (By Mr. Walker) Mr. Stanley, let me know when you can see the document.

A. Yes, I see it.

Q. What I am sharing with you, I will represent to you, is the transcript of the interview that David Udero gave to the Office of Professional Standards.

Do you remember listening to that audio

50 (Pages 194 to 197)

89b3e8af-4dbb-4a0e-8eec-f8d055cfea46

Michael D'Antonio, et al. v. New Mexico Corrections Department, et al.
Philip Stanley

December 12, 2023
No. 1:21-cv-01027-JB-GBW

Page 214

THE WITNESS: No.

Q. (By Mr. Walker) So based on the video, you can't say whether or not because it doesn't show Tyler Wheeler's and David Udero's interactions, correct?

A. No.

Q. At least in terms of the upper body?

A. No. All that can be seen is after he is put in handcuffs, he is pulled up off the floor, and you can see him being transported out.

Q. So the video, in no way exculpates Mr. Udero, right?

MR. ORTIZ: Objection. Form.

THE WITNESS: Can you define that word?

Q. (By Mr. Walker) It doesn't clear him of using force, does it?

MR. ORTIZ: Objection. Form.

THE WITNESS: No.

Q. (By Mr. Walker) And then I just want to clarify one last opinion on this prison admin component.

As a prison and jail administration expert, if the jury in this case accepts that Tyler Wheeler was having a medical emergency and it was known, what should the facility, be it correctional officer or medical staff, have done?

Page 215

MR. ORTIZ: Objection. Form. Foundation.

MS. LUERAS: Objection. Form. Foundation.

THE WITNESS: They should have either directly transported him to an outside hospital or called an ambulance to have him taken to an outside hospital.

Q. (By Mr. Walker) And I'm going to show you one last thing here.

MR. WALKER: All right. I'm going to mark this as Exhibit 14.

Q. (By Mr. Walker) Exhibit 14 is -- can you see this policy?

A. Yes.

Q. You reviewed this policy, right, when giving your opinions?

A. Yes.

Q. I'm going to scroll down. What is the purpose of this policy based on its plain language?

MR. ORTIZ: Objection. Form. Foundation.

THE WITNESS: It is intended to convey how an inmate is transported outside of the prison for either acute medical issues or psychiatric illnesses to an appropriate community health care facility.

Q. (By Mr. Walker) I'm going to scroll down here where it says "Medical Emergency."

Page 216

What does the policy say to do in paragraph A, 1, when there is a medical emergency? You can just read it straight out.

A. You are referencing number one?

Q. Correct.

A. "When qualified health personnel, the local health care authority, the warden, or the Shift Commander identifies an emergency medical situation that could result in the loss of life or serious harm to an inmate, he or she will immediately call 911 and request ambulance transport for the inmate to the nearest appropriate health care facility."

Q. So based on this policy and your expertise, what should prison staff or health care providers do when they see an inmate with a medical emergency?

MR. ORTIZ: Objection to form.

THE WITNESS: Well, this gets back to what I maintained earlier when questioned about the process, and that tells me that basically, anyone -- of course, there is a chain of command, but that could be the Shift Commander, could be the warden.

It doesn't require health care staff to identify emergency medical situations and get an inmate transported out. So, I mean, at the time that this occurred, whoever the responsible custody staff on-site

Page 217

was could have and should have called for an ambulance.

Q. Now, if this is what NMCD policy tells staff they should do, is it then appropriate for Nurse Hudson and Dr. Andrade, if she is recognizing a medical emergency --

MR. ORTIZ: Objection. Form. Foundation.

MS. LUERAS: Foundation.

Q. (By Mr. Walker) -- from an administration standpoint?

MR. ORTIZ: Objection. Form. Foundation.

MS. LUERAS: Join.

THE WITNESS: Yeah, I don't see that requirement in here.

Q. (By Mr. Walker) Do you see a requirement that only correctional officers or custodial staff can call 911?

A. No.

MR. WALKER: All right. No further questions.

MR. ORTIZ: Okay. I have some.

MR. WALKER: Hold on. I'd like to get a counting of defense counsel's time.

MS. KOPAN: I can't break that out right now.

MR. WALKER: It's a seven-hour deposition. It doesn't say one party gets seven hours. So how far

55 (Pages 214 to 217)

89b3e8af-4dbb-4a0e-8eec-f8d055cfea46